UNITED STATES, Appellant

v

DANIEL M. GORKO, Airman Second Class,
U. S. Air Force, Appellee

12 USCMA 624, 31 CMR 210

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellant, United States. With him on the brief was *Colonel Merlin W. Baker.*

*Major Quincey W. Tucker, Jr.,* argued the cause for Appellee, Accused. With him on the brief was *Colonel Joseph E. Krysakowski.*

## Opinion of the Court

KILDAY, Judge:

A tragic incident at Forbes Air Force Base, Kansas, led to accused's trial by general court-martial on a charge of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was convicted of the lesser included crime of unpremeditated murder under the same Article and was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for twenty-five years. The convening authority approved, but thereafter a board of review set aside the findings and sentence and ordered a rehearing. Pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Air Force has filed a certificate for review of the board's decision, requesting this Court to resolve the following issue:

"WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT, UNDER THE FACTS OF THIS CASE, THE LAW OFFICER COMMITTED PREJUDICIAL ERROR BY FAILING TO SUBMIT TO THE COURT-MARTIAL, UNDER INSTRUCTIONS RELATING TO VOLUNTARINESS, THE QUESTION OF WHETHER THE REQUIREMENTS OF ARTICLE 31(b) WERE APPLICABLE TO THE PRETRIAL STATEMENT OF THE ACCUSED?"

The nature of the certified question renders it unnecessary to set forth the evidence relating to the substantive offense. In that regard, suffice it to state the record shows that the victim—Airman Cheers—was shot and killed by accused during the early hours of May 27, 1960. Our concern is with an incident that transpired at the scene of the shooting after its occurrence.

At approximately 12:45 a.m. on the night in question, accused and the victim were posted as security guards at a gate to the flight line on the base. Quite shortly thereafter, one Francis—an airman on duty as "blotter clerk" at security headquarters, whose responsibilities included taking calls and making reports—received a telephone call from accused to the effect that he had shot Cheers. Francis asserted he expressed disbelief, whereupon accused repeated most emphatically: " 'I did shoot him, and I want you to call an ambulance right away.' " This witness also testified accused called him a second time inquiring whether medical assistance had been dispatched. There is no substantial difference in the accused's version of these telephone conversations.

The witness Francis gave the information he had received by telephone from accused to the desk sergeant on duty. And, Francis related, the desk sergeant in turn called an ambulance and notified a person Francis believed to be the flight commander—one Sergeant Holt—that accused had shot Cheers. Holt testified that as the result of information he received by telephone, he proceeded to the scene of the shooting. Conversations had by him

upon his arrival there give rise to the certified question.

The details of events transpiring at that time, and their exact order, are not entirely clear. Sergeant Holt, however, testified as to what was said and done as follows:

"A. When I arrived at Gate M, I saw Airman Gorko walking up and down on the south side of the gate. I also saw an unidentified airman lying on the north side of the gate shack. I went immediately around the gate shack to the north and found the airman to be Airman Third Class Cheers.

"Q. How did you know this was Airman Cheers? Had you known him previously?

"A. Yes, sir.

"Q. Go ahead.

"A. Airman Cheers stated that . . ."

Defense counsel immediately objected to any statement by Cheers and the law officer sustained the objection. The sergeant testified that he examined Cheers and found him to be wounded. Trial counsel then asked the witness if he had at that time talked to the accused. Holt responded affirmatively, stating he had asked accused what happened. Thereupon the defense objected to the response made by accused for the reason no predicate had been established for its admission. Accordingly, trial counsel adduced testimony that Sergeant Holt was not detailed as an air police investigator, but had gone to the scene to investigate in his capacity and in accordance with his responsibility as flight commander. As such, he claimed he was not a criminal investigator, and the prosecution argued the witness was neither performing in the latter capacity nor under any duty to investigate crime. Accused's statement to the flight commander, trial counsel urged, was made spontaneously at the scene in the absence of suspicion, and was admissible.

At that juncture the law officer questioned Sergeant Holt and received these answers to his inquiries:

"LO: Did you suspect Airman Gorko of having committed a criminal offense at the time of your investigation?

"A. No, sir.

"LO: Was this statement made to you in response to a question by you?

"A. Yes, sir."

Thereupon the law officer overruled the objection and permitted trial counsel to continue examining the witness. The following testimony was elicited:

"Q. And you asked him what?

"A. I asked . . . [the accused] what happened.

"Q. And he replied what?

"A. He replied, 'I don't know what happened, Sarge. I told him I was going to shoot him. I pulled my weapon and shot him.' "[1]

Sergeant Holt was also permitted to testify that the victim Cheers had, at the scene, stated to him, " 'He got me in the shoulder.' "

The accused's version of his conversation with Sergeant Holt, as given in his own testimony, may be gleaned from the following questions and answers:

"Q. When Sergeant Holt came, what then happened?

"A. He parked his car in the Gate 2 area, the other side of the fence. He got out of the car and I pointed to Cheers over there. He ran over there and as he ran over there, he asked me what happened and I believe I said I shot him.

"Q. Tell me exactly what you said to him.

"A. I was nervous and he asked me a couple of times. The only thing I could tell him was, 'I don't know what happened,' but I said, since Cheers had been shot, and I was the only one there, I must have shot him. He knelt down by him and as he knelt

---

[1] As the board of review pointed out, the highly incriminating nature of this extrajudicial statement allegedly made by accused, and its considerable impact on the findings, is obvious. It bears heavily on his intent, and in none of accused's other pretrial statements nor in his testimony on the stand does he admit intentionally shooting Cheers.

down, he asked me for a rag. I gave him my handkerchief, and he applied it to the wound.

"Q. Did you see it?

"A. I can't remember.

"Q. He asked for the handkerchief?

"A. Yes, sir. I remember giving it to him.

"Q. Did you have any further conversation with Sergeant Holt up to this point?

"A. About then he asked me what happened.

"Q. Did he ask you that twice?

"A. I think he asked me two times.

"Q. He is superior to you, is he not?

"A. Yes, sir."

It is undisputed that Sergeant Holt failed to advise the accused of the provisions of Article 31 of the Uniform Code, 10 USC § 831. While defense counsel did not request any instructions as to the effect of the ruling by the law officer in admitting the accused's incriminating statement, as testified to by the sergeant, the defense did object to the admission thereof. The law officer gave no such instruction to the court-martial, either at the time of his ruling or in his final charge to the members on the merits.

The board of review, concluding that an issue was raised as to whether or not Sergeant Holt suspected accused of an offense when he asked him "what happened," held that the law officer erred prejudiciously in failing to submit that question to the court members under appropriate instructions. See United States v Jones, 7 USCMA 623, 23 CMR 87; United States v Powell, 8 USCMA 381, 24 CMR 191; United States v Dison, 8 USCMA 616, 25 CMR 120; United States v Himmler, 9 USCMA 115, 25 CMR 377. It is that determination to which the certified issue relates.

The Government contends that the question of whether a person is a suspect within the purview of Article 31, supra, is interlocutory, is unrelated to factual voluntariness, and though posed by disputed evidence is for resolution by the law officer alone. In support of another avenue of attack, it is also urged by the Government that a conflict in the evidence is necessary in order to raise an issue of the variety necessitating ultimate resolution by the court-martial. From there it is argued that, assuming the question in the case at bar to be of the type for resolution by the triers of fact in a proper case, the board of review erred in its finding that the evidence in the present instance required such submission.

There can be no quarrel, as the board of review noted, but that a question whether Holt suspected accused was posed by the evidence. It is true the former testified he harbored no such suspicion; but that is not necessarily conclusive of the matter. See United States v Doyle, 9 USCMA 302, 26 CMR 82. And there are other factors which could fairly lead to either conclusion. For example, though the record does not indicate exactly what information was conveyed to Sergeant Holt, it may be inferred he was told what Francis had heard the desk sergeant tell someone. Thus, he may be found to have been on notice that accused was responsible for shooting his fellow guard, Cheers, when he proceeded to the gate, rather than going there only upon receiving general information as to some untoward event. In that case and if, as also may be concluded, the victim's statement was made to Holt before the latter asked accused for an explanation, then indeed there is sufficient predicate to support a finding of suspicion. Cf. United States v Wilson, 2 USCMA 248, 8 CMR 48.

On the other hand, in addition to Holt's explicit denial, other items are consistent with want of suspicion. Thus, there is evidence that in loosening the victim's clothing, the sergeant handed Cheers' weapon to accused. Further, there is testimony that accused was not disarmed by Holt, but surrendered his weapon later when his relief arrived to take over the guard assignment. Certainly those circumstances militate against concluding Holt subjectively suspected accused.

Thus, the issue was joined regarding suspicion. Even so, however, the law officer—after making his initial ruling on admissibility—did not submit this question to the court-martial members for their ultimate determination. And although the defense made no request for any such instruction, it did put the law officer on notice concerning the issue through its objection to the admissibility of the evidence. In light of that fact and, under all the circumstances, we do not deem the doctrine of waiver applicable. See United States v Dykes, 5 USCMA 735, 738, 19 CMR 31. See also United States v Williams, 7 USCMA 434, 22 CMR 224. Nor do we understand the Government to argue that the case is controlled by that principle. Consequently, we proceed to the merits of the question.

The provisions of Article 31, Uniform Code of Military Justice, supra, which are pertinent to our present inquiry, prescribe as follows:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

. . . . .

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

This Court has been called upon numerous times to construe Article 31 along with paragraph 140a, Manual for Courts-Martial, United States, 1951. We have consistently held that the initial question of whether to admit a confession or admission against interest is for the law officer. When he has done so, however, and the question of vol-

untariness is placed in issue by the evidence, the law officer must submit the matter to the court members for decision under appropriate instructions as to the authority of each to come to his own conclusion regarding the voluntary nature of the confession or admission in rejecting, or accepting, and weighing the same accordingly. See United States v Jones, supra; United States v Schwed, 8 USCMA 305, 25 CMR 115; United States v Perry, 8 USCMA 401, 24 CMR 211; United States v Wenzel, 9 USCMA 140, 25 CMR 402; United States v Bruce, 9 USCMA 362, 26 CMR 142. Cf. United States v Dykes, supra; United States v Higgins, 6 USCMA 308, 20 CMR 24.

In other instances this Court has made similar holdings where the question was raised whether the accused had been warned of his rights under Article 31, and on other occasions where the question was whether an accused was able to understand such advice as may have been given to him. See United States v Powell, supra; United States v Dison, supra; United States v Himmler, supra. See also United States v Gibson, 3 USCMA 746, 14 CMR 164.

In its disposition of this case the board of review has, essentially, required the same procedure in determining whether the accused was suspected of an offense by Sergeant Holt at the time of the critical conversation in which the former made such incriminating answers. And, as previously noted, the Government's principal argument is that the question posed in the present instance was an interlocutory matter to be determined by the law officer without the necessity of instructing the court members thereon and submitting it to them.

The Government invites attention to the fact that the exclusionary rule in the criminal courts of Texas bears marked similarity in many respects to Article 31 of the Uniform Code of Military Justice, supra. See Article 727, Vernon's Annotated Code of Criminal Procedure of the State of Texas, 1941. The Texas provision is to the effect that a confession shall not be

628

used if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in the custody of an officer, unless it be made after warning and in accordance with other requirements of Article 727 of the Texas Code. We agree that there is, in many ways, substantial similarity between the two statutes. For example, the question of whether an individual is under arrest is analogous to that of whether a person is a suspect, both situations being the basis for requiring a warning under the respective rules. Accordingly, decisions by the Texas courts may be of assistance in resolving the issue before us.

In that connection the Government cites Bingham v State, 97 Texas Crim 594, 262 SW 747 (1924), as a holding by the Court of Criminal Appeals of Texas that the controverted question of whether the defendant was in jail, place of confinement, or in the custody of an officer, is to be decided by the judge, not the triers of fact. Certain language from that decision would, at first blush, seem to support the Government's position. However, upon close analysis, we do not so understand the holding in the *Bingham* case. There the trial judge did not pass upon the question of whether the defendant was under arrest, but instead submitted the entire matter to the jury. It was held the trial judge had erred by avoiding the responsibility of making his own initial ruling as to whether the defendant's confession was made while he was under arrest. But, in addition, the Texas appellate tribunal went on to state, in answer to a motion for rehearing:

"... If, after hearing the inquiry, the judge is of the opinion that the proffered evidence is admissible, the evidence on the preliminary hearing may be embraced in a bill of exceptions, so that the reviewing court may decide with the facts before it whether the ruling of the trial judge was correct. If the evidence touching the arrest is conflicting or its truth called in question, the court, upon the request of the accused, may, by an appropriate instruction, call upon the jury to determine whether at the time the declaration was made the accused was under arrest. It is possible that instances might arise in which, on such request, the court should submit the matter to the jury." [262 SW at page 750.]

And other Texas cases indicate the propriety of a practice, under Article 727 of the Texas Code, supra, for the court to instruct the jury that if the defendant was under restraint at the time the statement was made, it should be disregarded. See Jones v State, 86 Texas Crim 371, 216 SW 884 (1919); Warren v State, 98 Texas Crim 639, 267 SW 723 (1924). Further, we note that such a practice is consistent with the requirement that when the evidence fairly raises the question of whether there has been a proper warning as provided by Article 727, such issue should be submitted ultimately to the triers of fact under appropriate instructions. See Benavides v State, 112 Texas Crim 52, 14 SW2d 67 (1929).

Perusal of Article 31 of the Uniform Code, supra, shows there are several criteria laid down which may require excluding an accused's extrajudicial statements from evidence. Previous decisions of this Court have recognized that various factors—including warning—which surround the making of a pretrial statement, may relate to whether the same is voluntary. See United States v Gibson, supra, 3 USCMA at page 751; United States v Josey, 3 USCMA 767, 780, 14 CMR 185; United States v Powell, supra; United States v Himmler, supra. And as we have previously pointed out, issues as to warning and voluntariness of statements are properly for consideration by the court-martial after an initial ruling admitting them into evidence, under the settled and approved procedure set forth in paragraph 140a of the Manual, supra.

It is true this Court has not heretofore directly passed upon the precise question as to whether the same procedures should be followed in determining whether an interrogator in fact suspected an accused at the time of a state-

ment by the latter. But we believe, consistent with the Texas cases cited, that a finding of whether an accused was suspected is markedly similar to a determination as to voluntariness and should be treated in the same fashion. Indeed, in United States v Aau, 12 USCMA 332, 30 CMR 332, we provided some indication of our view. In that instance a question was raised as to whether civilian police were, because of the nature of an existing cooperative agreement, acting as agents for military authorities. The opinion there observes that the evidence raised "a question of fact for the court-martial. It was submitted to the court for its determination by instructions," which we later pointed out would require the triers of fact to reject the statement if the civilian police were acting as an instrument of the military. 12 USCMA at pages 337 and 338.

There was substantial evidence as to whether or not the accused was suspected at the time Sergeant Holt questioned him. Further, there is no quarrel over the fact that accused was not warned in accordance with Article 31, supra, and the defense promptly and properly objected to the admission of the statement accused made to Holt. In view of all the matters we have previously set out, we hold the issue should have been submitted by the law officer to the court-martial for their ultimate resolution, in substantially the same manner as voluntariness. United States v Jones, supra; United States v Himmler, supra; United States v Aau, supra. Cf. United States v Ornelas, 2 USCMA 96, 6 CMR 96; United States v Berry, 6 USCMA 609, 20 CMR 325.

Of course, since we are not here confronted with such a situation, we express no view on, and our ruling does not pertain to, instances where a spontaneous exclamation may be involved.

The certified question is answered in the affirmative, and the decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

Had I been a member of the court-martial I might not have voted to convict the accused of unpremeditated murder because of a very definite doubt that he intended to kill Airman Cheers with whom he was on quite friendly terms. It is, therefore, with reluctance that I disagree with reversal of his conviction for the reasons advanced by the board of review and my brothers. I disagree for two reasons.

First, in my opinion the accused judicially reiterated the matters related in his pretrial statement to Sergeant Holt. United States v Trojanowski, 5 USCMA 305, 11 CMR 305. The accused testified that it was the first night the two were to work on guard duty together. At various times before they reported for guard duty they engaged in "horseplay." On several separate occasions the accused told Cheers he "was going to shoot him."[1] At 12:30 o'clock on the morning of May 26, 1960, they were posted together. The accused's account of what transpired is as follows:

"A. I started walking toward my post and Airman Cheers joined me. He was on my left-hand side and I was on his right. We walked together to the middle of the gate shack and didn't say anything. I walked toward the door and then I pulled my weapon out. In the truck I pulled my weapon out to release the magazine and put it in my pocket. When we got to the post, I inserted my magazine. I looked at Cheers and he had a grin on his face and he thought I was going to kid around. I didn't have any intention of doing anything.

• • • • •

"Q. Where were you at this time?
"A. Inside the building.

"Q. What did you do after the orange flash?
"A. I didn't do anything. I was scared. I had two stripes and my first thought was that I was going to get busted for firing my weapon.

"Q. What was your thought?
"A. I was going to get busted.

[1] Prosecution witnesses who were present on these occasions testified they considered the exchanges between the two to be humorous and joking.

"Q. What did you then do?

"A. I believe I put my weapon inside my holster and did an about-face and walked outside the gate house. As I was getting ready to do that, after I had done the about-face, I remembered that on the semi-automatic, after the cartridge is ejected, another one is put into the chamber. I took out my weapon and cleared it, ejected the large shell, put it in the magazine, and put the ammo in my pocket. The weapon was cleared and I put my weapon in the holster. I emptied the magazine again, put it in my pocket, and walked out.

"Q. What happened next?

"A. After I walked outside, I just walked around the building. Actually the end of the building was not very far. There was a trash can about twenty yards away. I looked there and saw Airman Cheers.

"Q. What was your first thought at that time?

"A. I thought he was joking or kidding around.

"Q. What did you do as a result?

"A. I went up to him and, as I did, he grabbed me around the legs, and I knew he was kidding. Then I started to go into a headlock and I felt the blood. I just dropped him and ran for the phone. There is a direct line to CSC. You just had to pick the phone up and it would connect you with CSC, but I just dialed 215. That was all I remembered.

"Q. What did you tell them?

"A. I believe Airman Francis was blotter and answered the telephone. I told him, 'This is Gorko. I just shot Cheers.'

"Q. Was this immediately after you had learned that Cheers had been hit?

"A. I don't think I could have run any faster to the phone than I did.

• • • • •

"Q. And you left him there as you felt this and ran to the phone?

"A. I just dropped him and ran to the phone.

"Q. And then you said, 'I shot Cheers. Send an ambulance.' What did you next do?

"A. Well, sir, they didn't believe me. I told them three or four times and then I swore, and I don't know whether he believed me or not. But I slammed down the phone and went back to Cheers and I said he could not die from the wound which was in the shoulder. While I was there, two cars passed the gate, leaving the flight line. I believe they were officers, as they saluted. I stood away from Cheers and waved them on. If I had known them, maybe I would have gotten help, but I was scared. I just waved them with my left hand and ran back to Cheers. I believe I called again. I believe it was Sergeant Holt again, and finally Sergeant Holt came."

The substance of every component of the pretrial statement is patently present in these extracts from the accused's testimony. There is the specific admission that he pulled out his weapon and shot Cheers; there is the specific denial of knowledge of what happened between the time Cheers grinned and ran away and "the orange flash" of the shot; and, finally, there is the very direct implication from the testimony that Cheers "thought" the accused "was going to kid around"; that the accused told him, as he had several times during the day, that he would kill him.

Secondly, in my opinion, Article 31, Uniform Code of Military Justice, 10 USC § 831, is not applicable to the challenged pretrial statement. In United States v Vail, 11 USCMA 134, 28 CMR 358, after reviewing many of the cases in this area we said: "Article 31 . . . cannot be applied without regard to the circumstances under which the statement is made." In principle, the circumstances under which the present statement was made are substantially similar to those before us in United States v Haskins, 11 USCMA 365, 29 CMR 181. There, the accused was relieved of his stewardship of certain funds. In the course of the audit of the funds, he was asked about cer-

**631**

tain records. We held that his response was admissible in evidence because the inquiry was not one which, under Article 31, supra, required preliminary advice of the right to make no statement. Here, as in *Haskins*, the accused had an official duty to perform. He filed a specific report in the discharge of that duty; as a result of the report, his regular supervisor asked him about the details and he made an appropriate response. In my opinion, the situation was not an investigation of the kind contemplated by Congress as included within the purview of Article 31. Cf. United States v Wilson, 2 USCMA 248, 8 CMR 48.

I would answer the certified question in the negative, and I would return the record of trial to the board of review for consideration of the merits of other matters raised by the record of trial.