UNITED STATES, Appellee

v

ELMER G. SCHAFER, Jr., Airman Third Class,
U. S. Air Force, Appellant

13 USCMA 83, 32 CMR 83

No. 15,030

May 18, 1962

*Lieutenant Colonel Wallace N. Clark* argued the cause for Appellant, Accused. With him on the brief were *Colonel James L. Kilgore, Colonel Joseph E. Krysakowski, Colonel Philip J. Williamson,* and *Colonel Daniel E. Henderson, Jr.*

*Major James Taylor, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker.*

## Opinion of the Court

KILDAY, Judge:

I

Accused was charged jointly with another airman with the instant crime but, because he desired enlisted personnel on his court-martial, the cases were severed and he was tried separately. Despite his pleas of not guilty, accused was convicted by general court-martial for premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to dishonorable dis-

charge, total forfeitures, reduction to the lowest enlisted grade, and confinement at hard labor for life. The convening authority approved and a board of review in the office of The Judge Advocate General of the Air Force affirmed. Thereafter, accused sought review by this Court and we granted his petition in order to consider several assignments of error raised in his behalf by appellate defense counsel.

Disposition of the case at bar does not necessitate a full development of the circumstances surrounding this callous murder. Accordingly, we may appropriately confine our consideration to such matters as are germane to resolution of the issues before us. For convenient treatment, the pertinent facts will be stated as we take up each respective issue.

## II

The crime with which we are concerned in the present instance was committed in March of 1960 at an Air Force base located in the State of New Jersey. Placing emphasis on the fact that it was a capital offense, the defense asserts, on the basis that the murder was committed in the United States and during time of peace, that the trial court was powerless to proceed in the premises. Initially, we direct our attention to this attack by accused on the jurisdiction of the court-martial. Before taking up that issue, however, we pause to note parenthetically that this Court affirmed a death penalty for peacetime murder perpetrated in California in United States v Henderson, 11 USCMA 556, 29 CMR 372. In all candor, however, it must be acknowledged that the present issue was not, in that case, squarely argued or considered by us. Therefore, we turn our attention to its merits.

In urging their position upon us, appellate defense counsel recognize the power of Congress to provide for courts-martial under its authority "To make Rules for the Government and Regulation of the land and naval Forces"; and the "necessary and proper" clause. Constitution of the United States, Article I, Section 8. But, so the thread of the argument runs, such power is hedged in by other constitutional provisions which must be taken into consideration. Thus, trial by an impartial jury of the district where the crime was committed is prescribed. Article III, Section 2, and Amendment VI. Further, our attention is invited to the language of the Fifth Amendment which, in mentioning capital offenses, specifies the requirement of indictment by grand jury "except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." In sum, we are urged to hold that a special niche has been carved out for capital offenses committed in the United States during time of peace, and that when a serviceman is so charged it is neither necessary nor proper to deny him trial by jury.

That we are not disposed to do. True it is that under the precursors to our present military murder statute, prosecutions could not be had during peacetime for such offenses committed in the United States. But that is not so under Article 118, Uniform Code of Military Justice, supra. See United States v French, 10 USCMA 171, 177, 27 CMR 245. And we perceive no constitutional impediment to this different result under the different statute.

It has long been settled that the restriction to "time of War or public danger," mentioned in the Fifth Amendment, applies only to the militia. Johnson v Sayre, 158 US 109, 39 L ed 914, 15 S Ct 773 (1895). Thus, in the case of an accused serving in the armed forces, there is no merit to the defense argument, insofar as it is predicated on drawing a distinction as to peacetime offenses. See also Ex parte Milligan, 4 Wall 2, 124, 141 (US 1866). And neither, of course, can the locus of the crime, nor the penalty therefor, make any difference, for those amenable to military justice under Article 2 of the Code, 10 USC § 802, are subject thereto in all places under the clear extraterritorial applicability prescribed for the Uniform Code in Article 5 thereof, 10 USC § 805. As the Supreme Court of the United States re-

cently held in Kinsella v United States, 361 US 234, 4 L ed 2d 268, 80 S Ct 297 (1960):

> "The test for jurisdiction, it follows, is one of *status*, namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'

> . . . . . .

> ". . . the power to 'make Rules for the Government and Regulation of the land and naval Forces' bears no limitation as to offenses. The power there granted includes not only the creation of offenses but the fixing of the punishment therefor. If . . . [the accused] are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses."

See also the opinions in Burns v Taylor, 274 F 2d 141 (CA 10th Cir) (1959), cert den 364 US 837, 5 L ed 2d 62, 81 S Ct 73; and Owens v Markley, 289 F 2d 751 (CA 7th Cir) (1961), which involve the identical legal principle with which we are here concerned. In those instances the capital offense charged was rape and the courts declined to accept the same argument as is presently pressed upon us. We, too, conclude the contention is without merit and accordingly reject this challenge to jurisdiction.

### III

In another assignment of error it is asserted that two extrajudicial confessions by accused were erroneously admitted into evidence. Both are rather detailed written accounts relating how he and his fellow offender, who was tried separately, stabbed and killed the victim. A development of the relevant facts will be of aid in resolving this issue.

About five o'clock on the afternoon of March 1, 1960, the victim, an Airman Cartwright, and another airman named Phillips repaired to the base exchange to drink beer. During the course of the evening they were joined by two other men. The identity of this last mentioned pair was unknown to Phillips, but they were later established to be accused and his coactor in this crime. The four men left the base exchange together and thereafter Phillips parted company with his companions, proceeding to his own billet and leaving Cartwright with the other two men.

That was the last time the victim was seen alive. Approximately two hours later, around midnight, his corpse —nude save for shoes and socks—was discovered in the darkened hallway of a building in the "26th area" of the base. The circumstances shrieked of foul play. Further, bloodstained clothing had been recovered in that area, and a trail of what seemed to be blood led from the building where Cartwright's body was found toward barracks in the 26th area.

Those being the existing circumstances and with the murderer at large, his identity unknown, and the weapons used unrecovered, the base commander authorized a search. This was at about 3:40 a.m., and the authorization granted permission to search the so-called "26th area"—a block in which some twenty barracks, three mess halls, and two other structures were located—and to seize items pertinent to investigation of the murder.

Accused makes two separate contentions in asserting the inadmissibility of his confessions. One ground is that the above-mentioned search was unlawful and that his extrajudicial statements must be deemed the product thereof. Characterizing the purported authority granted by the commanding officer as a wholesale fishing license, appellate defense counsel urge that it was an abuse of sound discretion and illegal for the reason that it "fails to meet the test of proper authority, reasonableness, definiteness, certainty and clarity, all essential prerequisites to a lawful search."

The Government answers, with a good deal of persuasion, that accused lacks the necessary standing to complain regarding certain of the articles involved in the search. But, quite apart from that fact, counsel for the Government point out accused had al-

ready effectively orally confessed to all material particulars of the killing and such admissions were in the process of being reduced to writing before accused was ever apprised investigators had found the incriminating property. Thus it is urged a causal connection between the search and the confessions is absent. See United States v Spero, 8 USCMA 110, 23 CMR 334. We need not, however, and do not, pass on that contention. Rather we prefer to treat with the problem of the legality of the search on its merits.

It is not open to question that, in situations of the nature with which we are here concerned, a ██ search authorized by a commanding officer upon probable cause is legal. Manual for Courts-Martial, United States, 1951, paragraph 152; United States v Harman, 12 USCMA 180, 30 CMR 180; United States v Gebhart, 10 USCMA 606, 28 CMR 172; United States v Brown, 10 USCMA 482, 28 CMR 48. Obviously, a search so predicated is reasonable and, therefore, not unlawful. We are of the view that the instant search falls into that category. Here the action taken was not based on bare suspicion, but was virtually compelled by the circumstances. Clearly a grave crime had been committed, and from the location of the body, the clothing that was recovered, and the blood spots, it was reasonable to conclude leads might be developed in the "26th area." Thus the scope of the search was not unduly broad; although it was somewhat generalized, it was not unreasonable under the circumstances. The factors available to the commander's consideration fairly dictated a search of the area embraced in the authorization. Therefore, on the basis of the cases cited above, we reject this branch of the assigned error.

## IV

The other ground upon which the defense argues accused's written confessions were inadmissible is that certain preliminary inquiries were made of him at the time he was taken into custody without at that time advising him under Article 31, Uniform Code of Military Justice, 10 USC § 831. Determination of this question requires recital of additional facts.

The witness Phillips to whom we made prior reference had, after Cartwright's body was discovered, apprised authorities he had been with the victim earlier. Further he related that, although he did not know their names, two men were with the deceased when he left the group. Accordingly, Phillips accompanied an agent from room to room as inquiry was made of those billeted in the barracks in the area. The queries put to each individual concerned his name, whereabouts and companions of the evening. In due course the room occupied by accused was checked. This was shortly before 4:30 in the morning.

The agent continued his previous pattern by awakening accused and asking his name and whereabouts. At this point Phillips left the room and, when the agent followed, advised him he believed accused to be one of the two men with whom he had last seen Cartwright. The agent thereupon—and admittedly without warning accused—elicited from him his name; the fact that he had been at the base exchange in the company of a named person who, it later turned out, was his partner in the killing; and the location of the latter's billet. After checking the quarters of the other man, accused was taken into custody and removed to Office of Special Investigations Headquarters. Subsequent interviews at different times resulted in the two written confessions in question here, but proper Article 31 advice was given as to them.

We are urged by the defense, which relies heavily on United States v Wilson, 2 USCMA 248, 8 CMR 48, to hold that as a matter of law the above-stated facts rendered accused a suspect whom the agent was bound to warn before questioning him. And, the reasoning proceeds, the two written statements were the result of the prior unwarned answers accused had given the agent, and hence should have been barred from evidence by the law officer.

We cannot agree. In our opinion, it

**87**

is unnecessary to decide whether, as the Government argues, the answers given by accused provided no additional knowledge to the agent; if they were nonincriminating; or whether the remarks made by accused at that time were so insignificant they could not have motivated his later full and detailed confessions. Rather, as with the first branch of this assignment, we deem it appropriate to go straight to the heart of the matter and consider the necessity for a warning.

The agent unequivocally and categorically denied that he suspected accused at the time the preliminary questions were asked, and we believe it may fairly be concluded from other surrounding circumstances that the witness' denial may be accepted. Cf. United States v Doyle, 9 USCMA 302, 26 CMR 82. Thus, at the time the agent first saw accused there was nothing whatever to tie the latter with the offense in any way. Nor, after Phillips told the agent he believed accused was one of the two men they were attempting to locate is a finding of suspicion compelled. Rather, the agent averred that he considered accused at that point to be merely a material witness and, indeed, the preliminary questions posed by the agent at that juncture seem calculated only to corroborate Phillips' belief that accused was an individual who might throw light on the investigation.

But surely, unlike the *Doyle* and *Wilson* cases, supra, it cannot be said there was suspicion as a matter of law. Here the accused was not found standing over a corpse with a discharged weapon in his hands. Nor was he known to have handled funds which were missing and made dilatory, evasive, and unsubstantiated explanations therefor. In contrast, the scene of the murder was somewhat removed from accused's room; several hours had elapsed since he was known to have been with the deceased; and nothing at that point indicated the two men described by Phillips were in any way connected with or responsible for the victim's death. All that was known was that accused had left the base exchange in company with Cartwright some two hours before

the latter was found dead. Under those circumstances, we cannot say an Article 31 warning was required prefatory to the preliminary questions as a matter of law. As was stated in United States v Hopkins, 7 USCMA 519, 22 CMR 309, if there is evidence from which the law officer might fairly conclude no duty to warn arose, this Court is not free to overturn his ruling.

Moreover, we note parenthetically that in his instructions to the court-martial the law officer covered the voluntariness of accused's extrajudicial statements—oral and written—both as it might possibly be affected by evidence obtained illegally, and as to the impact of the questioning of one suspected of an offense without the requisite Article 31 advice. See United States v Gorko, 12 USCMA 624, 31 CMR 210.

For the above-stated reasons, we must resolve this second branch of the assignment adversely to accused. The law officer did not err in refusing to disallow the written confessions from evidence.

## V

The final assignment pressed upon us by the defense may be given short shrift. It is contended that the law officer erred in his instruction to the court members on accused's extrajudicial statements. They argue he charged the court-martial not to consider the statements if the same were found to be the product of an illegal search and seizure, without apprising the members of the court how to resolve the question of lawfulness of the search.

First, as set forth earlier, the facts of this case support the conclusion that the search was properly authorized. And, under our decisions in United States v Ornelas, 2 USCMA 96, 6 CMR 96; and United States v Berry, 6 USCMA 609, 20 CMR 325, the resolution of the legality of a search is an interlocutory issue for the law officer's determination.

Regardless of that matter, however, here the law officer sought to submit

the question to the court-martial. And the record reflects that an instruction in that area had been requested by trial defense counsel, that the latter assisted and participated with the law officer in formulation of the charge actually given to the members of the court, and that he expressly voiced his approval and concurrence therein. Manifestly, under those circumstances, accused has no standing to assert reversible error on the basis of the questioned instruction. United States v Crigler, 10 USCMA 263, 27 CMR 337; United States v Jones, 7 USCMA 623, 23 CMR 87; United States v Beer, 6 USCMA 180, 19 CMR 306.

## VI

In view of the foregoing discussion, and finding no error in the proceedings in the instant case prejudicial to accused's substantial rights, we affirm the decision of the board of review.

Chief Judge QUINN and Judge FERGUSON concur.