UNITED STATES

v.

Ambrose JONES, III, Fireman Apprentice, U. S. Coast Guard.

CGCM 9948.
Docket No. 804.

U. S. Coast Guard Court of Military Review.

1 Nov. 1977.

Trial Counsel: LT Michael J. Perrone, USCGR.

Defense Counsel: LT Michael G. Barrier, USCGR.

Individual Defense Counsel: LT William K. Bissell, USCG.

Appellate Defense Counsel: LT Patricia L. Shebest, USCGR.

Appellate Government Counsel: LT Malcolm J. Williams, USCGR.

OPINION

BRIDGMAN, Judge:

On 21, 22 and 23 June 1976 the accused was tried by a general court-martial composed of judge alone. Two of the offenses charged did not result in findings of guilty

and the accused entered a plea of guilty to a charge of unauthorized absence. He was also found guilty of a charge and specification under Article 92(1), UCMJ, 10 U.S.C. § 892(1) of possessing marijuana, in violation of paragraph 9–2–15, U. S. Coast Guard Regulations. It is with this offense that we are concerned.

The offense took place on board the USCGC GLACIER (WAGB–4), an icebreaker. Prior to the offense the vessel had completed an extended operation in Antarctic waters and had stopped at various South American ports on her homeward voyage. On 25 March 1976 the GLACIER departed Callao, Peru. Shortly after departure a thorough "inspection" or "search" of the vessel was undertaken on orders of the Commanding Officer. During this activity the marijuana, which forms the basis for the charge in this case, was discovered in the accused's locker. At the trial, and again before this Court, the accused contends that the marijuana was found during an illegal search and is inadmissible in evidence.

The cornerstone of any examination of a problem involving the finding of evidence of criminal conduct and its subsequent use. as evidence is the Fourth Amendment which provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." While each of the elements of this sentence has its own plethora of judicial interpretations, the essence of the Amendment is that "unreasonable" searches and seizures are prohibited. Translation of this abstract concept into workable guidelines for the decision of a particular case has divided courts, judges, and scholars for years. The difficulties besetting a court are aptly illustrated by two recent decisions of the Court of Military Appeals; *United States v. Thomas*, 24 U.S. C.M.A. 228, 51 C.M.R. 607, 1 M.J. 397 (1976) and *United States v. Roberts*, 25 U.S.C.M.A.

39, 54 C.M.R. 39, 2 M.J. 31 (Interim, 1976) in both of which no two judges applied the same rationale.

As complex as are the cases arising in the civilian community, applying the constitutional principles to the military situation increases the complexity. It is a fundamental principle that persons serving in the armed forces are not divested of all their constitutional rights as individuals, however, it is equally well recognized that certain individual rights cannot be exercised in a military setting to the extent they can in the civilian setting. Time and circumstance require the balance to be struck at different points. *United States v. Kazmierczak*, 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967). In determining whether a particular search, or inspection, is reasonable the need must be weighed against the intrusion into the rights protected. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The division of opinion has occurred, in many instances, because of the variety of approaches which may be taken (search or inspection), the location (common space or private area), and the means of discovery (does the search take place when the locker is opened or when a trained dog "alerts" on the locker). *United States v. Thomas* and *United States v. Roberts*, both *supra*. In this instance no means of enhancing the human senses were utilized; and the accused's locker is conceded to be a space in which he has a reasonable expectation of privacy. See *United States v. Roberts, supra*. In addition, this Court is of the unanimous opinion that, whatever the title bestowed upon the proceedings on board the GLACIER on 25 March 1976, the evidence at issue was discovered as the result of a "search", to the extent such characterization still is meaningful under current military law. *United States v. Hayes*, 3 M.J. 672 (A.C.M.R.1977), *United States v. Hay*, 3 M.J. 654 (A.C.M.R.1977).

In this instance, even before the GLACIER departed on the Antarctic mission the commanding officer had been concerned

about the availability of drugs in some South American ports. A ship's notice dated 7 December 1975 stated that a search of the ship would be made prior to the vessel's return to the United States. Because of the availability of drugs on the streets in Lima, Peru, the decision was made to search the ship immediately after departure. Although the commanding officer thought he had a serious drug problem, the search was not based on any specific information and he did not consider himself as authorizing a search based upon probable cause. Although drugs were of concern, the search was held to find any unauthorized items such as alcohol, and to rid the ship of any contraband.

While "probable cause" is the usual standard by which to measure the reasonableness of a search, it is not the only standard. Whether labeled a search or an inspection, other types of examination have been found not violative of the protection against unreasonable search. *United States v. Poundstone,* 22 U.S.C.M.A. 277, 46 C.M.R. 277. However, recent decisions of the United States Court of Military Appeals require reappraisal of the earlier precedents.

In *United States v. Thomas, supra,* all three judges held that the evidence found was inadmissible. Judge Cook focused on the intrusion into the locker and found a lack of probable cause to authorize a search of that particular locker. Chief Judge Fletcher concluded that military commanders have authority to conduct reasonable inspections without probable cause, but would prohibit the use of the fruits of such inspections as evidence. Senior Judge Ferguson focused on the initial walk through the barracks with a trained dog, holding that this constituted a search under circumstances which did not amount to probable cause.

In the subsequent case of *United States v. Roberts, supra,* the court split as to the admissibility of the evidence. Judge Perry found the "shakedown inspection", defined as a search of a general area, of all persons and things in that area, for specific fruits or evidence of a crime, based upon "probable cause" to believe that such material will be found somewhere in that general area, to have no constitutional basis. Noting that the "shakedown inspection" was for the sole purpose of discovering marijuana and was conducted in the pre-dawn hours using trained dogs, Judge Perry, writing the opinion of the court, stated, "While the traditional military inspection which looks at the overall fitness of a unit to perform its military mission is a permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion which a serviceperson must expect in a military society—the 'shakedown inspection' as earlier defined in search specifically of criminal goods or evidence is not such a permissible intrusion into a person's reasonable expectation of privacy, even in the military setting." *United States v. Roberts,* 25 U.S.C.M.A. at 48, 54 C.M.R. at 48, 2 M.J. at 36.

Chief Judge Fletcher concurred in the result, citing his separate opinion in *Thomas.* Judge Cook disagreed with Judge Perry's conclusion that there is no constitutional support for the "shakedown inspection."

■ Some important distinctions need to be made in this case. First and foremost the events took place on board a vessel at sea. While we by no means intend to imply that the constitutional rights of members of the seagoing services are any less than those of their counterparts on land, the fact remains that these rights are being applied in differing circumstances. The cases in this area have analogized and distinguished the military base or complex and a civilian community; company housing areas or barracks accommodations and homes; and "common spaces" and public areas. This approach is realistic in most cases. The serviceperson on land, with some exceptions, has his accommodations separate and distinct from the places where he performs his duties, receives his training, and, when the need arises, engages in battle. The larger the military installation, the more valid the comparison. Servicepersons off duty in their quarters on a large military complex may, like their civilian counter-

parts, not even be aware of or affected by, much less have to respond to, incidents occurring elsewhere on the installation, and may have a reasonable expectation that their activities within their quarters, or houses, will be free from intrusion.

A vessel, such as the GLACIER, while at sea can be likened to a small, self-contained community. It has work areas and living areas. Within its designed limits it provides a wide variety of community support services including such services as medical treatment and firefighting. However, distinctions must be made. The GLACIER frequently, as in this instance, operates independently in remote areas. The GLACIER measures only 310 feet from bow to stern and 74 feet from side to side. Within that area are located spaces containing high explosives, diesel fuel, and aviation fuel. Living areas are dispersed throughout the ship and are frequently utilized as work areas or staging areas for firefighting or casualty repair efforts. Vital components of the ship's structure, machinery, and control systems are often present in berthing areas. A fire or other casualty in a berthing compartment can affect the safety of the entire ship as much as a similar event in any other location.

The complement of a naval vessel, such as the GLACIER, functions differently from civilian communities and most military installations ashore. All members of the crew, whether on duty or not, are assigned closely coordinated tasks to be performed in the event of fire, collision, or other emergency and must respond instantly at any time. The failure of a crew member to promptly assume his pre-assigned position not only impairs the capability of the ship to respond to the emergency, but it also creates additional demands in ascertaining the whereabouts and safety of the missing person. To an extent not found ashore, the safety of the vessel, and more importantly the persons on board, depends on each member of the crew, twenty-four hours a day. No crew member may withdraw to the privacy of his living area and ignore events in the community around him and the community, being so dependent upon each of its members, cannot ignore the activities of the individual.

Secondly, this search was not one directed solely towards the discovery of drugs although Judge Perry apparently recognizes this as "a legitimate motive going to the fitness of [a unit] to perform its military mission . . ." *United States v. Roberts*, 25 U.S.C.M.A. at 47, 54 C.M.R. at 47, n. 15, 2 M.J. at 35. No specially trained dogs were employed. No criminal investigators or special police were on hand to speed the prosecution of those discovered to have drugs in their possession. While drugs were of concern to the commanding officer and prosecution was a possibility, his concern was to rid the ship of all contraband.

Third, the search was held at a reasonable time, involved the entire ship, and was conducted under conditions which minimized the invasion of what privacy exists aboard ship. No one was awakened at 4:30 a. m. by having the door to his room opened with a passkey to admit a search party with a trained dog. See *United States v. Roberts, supra.* The search took place in the middle of the day and each person was called individually to open his locker when that portion of the ship was being searched.

Fourth, although the search was conducted without immediate prior notice, all members of the crew knew, or should have known, that a thorough inspection of the ship for contraband would be undertaken before the ship returned home.

The alternatives for the commanding officer were to do nothing, or, possibly, to limit the search to those areas of the ship where no individual had any expectation of privacy. Either would be an abdication of his responsibilities for the safety of the ship and its crew. Although lacking probable cause to believe that a specific individual had drugs on board, he had reason to believe that conditions on his ship presented a real and present danger. He could possibly be charged with dereliction of duty if he failed to take positive action to ensure, insofar as possible, the readiness of his ship and crew to meet whatever exigencies the voy-

age might present. *United States v. Mitchell*, 3 M.J. 641 (A.C.M.R.1977).

■ We are of the opinion that the action of the commanding officer was reasonable. Apparently Chief Judge Fletcher would also permit a commander to conduct such inspections for drugs, but he would then deny the use of the fruits of such inspections as evidence. *United States v. Thomas, supra.* The exclusionary rule was not designed to bar the results of a reasonable search from evidence. To deem a search or inspection reasonable for one purpose, but deny the use of the results presents both practical and legal problems. If the search is legal, any evidence obtained should be usable in a subsequent prosecution. *Committee for GI Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466 (1975). If the otherwise valid evidence that is seized in a reasonable inspection cannot be used for appropriate disciplinary or other proceeding, military morale and discipline are eroded. *United States v. Hayes*, 3 M.J. 672 (A.C.M.R.1977). Such actions would constitute an invitation to would-be drug smugglers. If there is no inspection, they reap the profits. If the drugs are found as the result of an inspection, no disciplinary action can be taken. We do not believe that proper concern for the rights of the individual serviceperson requires this result. Since neither Judge Perry nor Judge Cook joined in the Chief Judge's opinions in *Thomas* or *Roberts*, we do not feel constrained to apply such a rationale.

■ The offense was charged as a violation of Coast Guard Regulations, paragraph 9–2–15 rather than the ship's regulations, section 4203. The appellant has argued that charging the marijuana offense as a violation of a general regulation, under Article 92(1) UCMJ rather than as a violation of a lawful order, under Article 92(2) UCMJ constitutes a denial of due process. We disagree. Unlike *United States v. Courtney*, 24 U.S.C.M.A. 280, 51 C.M.R. 796, 1 M.J. 438 (1976) there is a rational basis for determining which portion of Article 92 is to be used. Paragraph 171*b*, MCM, indicates that Article 92(2) contemplates violations "which are not chargeable under Article 90, Article 91, or Article 92(1)." If the appellant's view were to prevail, every subordinate commander who issued orders to implement a general order or regulation would reduce the effect of the general order to that of "all other lawful orders." General orders or regulations are properly published by senior officers for the government of the forces under their command. Their effect cannot be subverted by the acts of an inferior official.

The findings of guilty and the sentence are affirmed.

Judge BURGESS concurs.

Chief Judge ROSENWASSER filed opinion concurring in part and dissenting in part.

Judge MAGUIRE filed opinion concurring in part and dissenting in part.

Captain and former Judge YOUNG was present at the argument but did not participate in the decision of the case.

ROSENWASSER, Chief Judge (concurring in part and dissenting in part):

I concur only in approving the finding of guilty of AWOL. I disagree with Judge Bridgman's opinion that the search aboard the GLACIER was lawful.

As the opinion acknowledges, the contraband[1] found in Ambrose Jones' locker was discovered in the course of a "search" as distinguished from an "inspection". As the government conceded on oral argument, no probable cause to search Jones' locker existed.

The view of the majority is that the search was reasonable, and therefor lawful, irrespective of probable cause. Today's holding, then, is that a shakedown search

---

1. A small bag with 7.7 grams of marijuana; a can of beer; and a plastic bag with 43.5 grams of cocaine. Jones was correctly acquitted of the cocaine possession; presumably another person tossed it in his locker at the onset of the search. No offense was charged for the beer possession.

aboard a military vessel at sea, authorized by the commanding officer, based on suspicion that drugs were brought aboard, but without probable cause, is lawful.

This holding revives a view of search law that presumably was laid to rest in 1959 by the opinion in *United States v. Brown*, 10 U.S.C.M.A. 482, 28 C.M.R. 48. In the same year, and with specific regard to shakedown searches, Chief Judge Quinn, in *United States v. Gebhart*, 10 U.S.C.M.A. 606, 610, 28 C.M.R. 172, 176 declared:

. . . it can be said with assurance that the exercise of the authority to search must be founded upon probable cause, whether the search be general in that it includes all personnel of the command or subdivision, or limited only to persons specifically suspected of an offense.

And the Navy's JAG Journal for July-August 1966, at page 3, stated:

It is now well-settled law that a Commanding Officer may not act upon a "reasonably founded suspicion" but must have "probable cause" before ordering or authorizing a search.

Only a year ago, the Court of Military Appeals reversed the Air Force Court of Military Review which, like our court today, held that a shakedown search for drugs, conducted without probable cause, was lawful. In *United States v. Roberts*, 25 U.S.C.M.A. 39, 54 C.M.R. 39, 2 M.J. 31 (interim), reversing 50 C.M.R. 699, the lead opinion by Judge Perry observed:

The so-called "shakedown inspection" is not a new phenomenon to this Court. E. g. *United States v. Drew*, 15 U.S.C.M.A. 449, 35 C.M.R. 421 (1965); *United States v. Harman*, 12 U.S.C.M.A. 180, 30 C.M.R. 180 (1961); *United States v. Gebhart*, 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959). Apparently, the event is contemplated as a thorough search of a general area, such as a barracks or a group of buildings (as opposed to a particular living area or room) of all persons and things in that area (as opposed to a particular, suspected person) for specific fruits or evidence of a crime, based upon "probable cause"

to believe that such material will be found somewhere in that general area. This Court is unable to discern the constitutional basis for such a fishing expedition, nor is one apparent in this Court's precedents which seem merely to accept such a procedure as one "which has long been recognized." *United Staets v. Harman, supra* at 183, 30 C.M.R. at 183.

Judge Perry's opinion concluded:

While the traditional military inspection which looks at the overall fitness of a unit to perform its military mission is a permissible deviation from what may be tolerated in civilian society generally— recognizing that such procedure is a reasonable intrusion which a serviceperson must expect in a military society—the "shakedown inspection" as earlier defined in search specifically of criminal goods or evidence is not such a permissible intrusion into a person's reasonable expectation of privacy, even in the military setting.

It should be emphasized that the decisions in *Drew, Harman* and *Gebhart, supra,* as well as the decision in *United States v. Schafer*, 13 U.S.C.M.A. 83, 32 C.M.R. 83 (1962), recognized the validity of shakedown searches *only when probable cause* was present. In the instant case there was not even a pretense of probable cause; nor was probable cause asserted in the government's appellate brief. To the contrary, the GLACIER's Captain testified: "The search that I authorized . . . was not based on any specific information given to me . . . I did not consider myself authorizing a probable cause search."

We have the Captain's further testimony that he had determined upon a search to take place following the stop at Callao, Peru before the ship had even left the United States. He had done so, he said, because drugs were "freely available in the street at greatly reduced prices"; and, "after seeing what was available last year . . . I thought there would be too much temptation for the same people to go back a second time . . . .." He also declared: "In Lima people approached officers and chief

petty officers, so we knew that the crew would be exposed to this situation."

As the record shows, the search was based on an educated guess, on bare suspicion.

Judge Cook, writing the lead opinion in *United States v. Thomas*, 24 U.S.C.M.A. 228, 51 C.M.R. 607, 1 M.J. 397 (1976), while upholding the right of government agents to walk through a barracks with a trained marijuana dog, nevertheless found the search of the defendant's locker in that case to be unlawful because of the insufficiency of the evidence or probable cause presented to the commanding officer.

Still more recently, in *United States v. Wilcox*, 3 M.J. 863 (A.C.M.R.1977) a generalized search ordered by a battalion commander resulted in discovery of a missing Army field telephone in the defendant's locker, located in a cubicle of his company barracks. He was charged with larceny and convicted. The court set the conviction aside. The opinion stated that the commander's belief that marijuana use was increasing, and his knowledge that government property was missing in two of the battalion's companies, did not afford "sufficient probable cause for a search of all living quarters in the battalion. The search was unreasonable; the evidence, inadmissible."

What the case law from *Gebhart* in 1959 to *Wilcox* in 1977 demonstrates is that a shakedown search cannot be a "reasonable" search in the constitutional sense without the existence of some form of probable cause.

I find nothing in the facts of the instant case to persuade me that the *need* to search was so great as to be an acceptable substitute for probable cause; or so compelling as to outweigh the rights of the enlisted men of the GLACIER to be secure in the bit of privacy afforded them aboard ship. Was the search necessary to prevent the illegal importation of cocaine into the United States? A customs inspection upon arrival in Long Beach would have satisfied that need. Was there a dangerous drug problem aboard ship? The Captain's testimony provides an answer:

I don't think the conditions on the GLACIER as far as marijuana is concerned are any different than any other ship in the Coast Guard . . . I have never had anybody brought to mast for the use or possession of drugs while on watch.

Nothing shown in the record of this case constituted sufficient justification, in my opinion, for the intrusion of every enlisted man's locker aboard the USCGC GLACIER on 25 March 1976. I would set aside the conviction of marijuana possession and reassess the sentence.

MAGUIRE, Judge (concurring in part and dissenting in part):

I agree with Judge Bridgman's opinion and rationale upholding the validity of the search and the admissibility of the evidence obtained in the search.

For the reasons expressed in dissents in *United States v. Wiles*, 3 M.J. 577, 582 (C.G.C.M.R.1977), and *United States v. Torrence*, 3 M.J. 804, 806 (C.G.C.M.R.1977) I would however dismiss the specification alleging unlawful possession of marijuana. (It would be fruitless here to elaborate on why I would class marijuana with cocaine in this context, recognizing that a potential distinction could have been made under other circumstances, and acknowledging that considerations involving the opinion in *United States v. Courtney*, 24 U.S.C.M.A. 280, 51 C.M.R. 796, 1 M.J. 438 (1976), cited in the Opinion, could lead to some artful juggling of legal concepts.)

Since the division of the court results in a total affirmance of the sentence, I note only that my view would necessitate an adjustment of the sentence to account only for the unauthorized absence.