UNITED STATES, Appellant

v.

FORREST L. LAWRENCE, Steward Apprentice, U. S. Navy, Appellee

3 USCMA 628, 14 CMR 46

No. 2790

Decided January 15, 1954

CDR Richard J. Selman, USN, for Appellant.
CAPT Francis C. Foley, Jr., USMCR, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A special court-martial convened aboard the USS SIERRA, convicted the accused under one of two specifications purporting to allege violations of Article 132, Uniform Code of Military Justice, 50 USC § 726. So much of the sentence as provided for a bad-conduct discharge and confinement at hard labor for two months was approved by the convening authority. However, a Navy board of review concluded that the specification under which the accused was found guilty was fatally defective and set aside the findings and sentence. The single issue of legal sufficiency of the specification was certified to this Court by The Judge Advocate General, United States Navy, in accordance with the provisions of Article 67(b)(2) of the Code, 50 USC § 654.

The specification now under attack reads in its material portions as follows:

"In that Forrest L. LAWRENCE, stewardsman apprentice, U. S. Navy, USS SIERRA (AD18), for the purpose of opening a temporary pay record,.

630

did, on board the USS Sierra (AD 18), on or about 17 September 1952, make an oath, to wit: I solemnly swear or affirm that the facts stated and disclosed below are true to the best of my knowledge and belief, and request that a temporary pay record be opened in my name: a. my pay record was last carried on USS Forest Royal (DD872). b. (2) I became separated from my pay record on 21 August 1952 because of a fire on the train of which I was a passenger. c. My rank or rating is TA, and dated from 20 Dec 1950 on which date I was attached to USS Forest Royal (DD872). d. I completed 8 years service for pay purposes on 7 July 1952. e. My name last appeared on the Regular money list of the USS Forest Royal (DD872), on which my pay was computed to 1 August 1952. (1) My account did not show an overpaid balance and I received $(none) by check and $40.00 in cash; I left (none) undrawn. f. I am entitled to the following credits for allowances and additional pay. Basic allowance for Quarters (W) (LC) Standard Maintenance Allowance. g. I reenlisted on 7–7–49. h. I had the following allotments of pay effective during the month of loss of my pay record:

. . . . .

"i. I have the following dependents (name and relationship): Myrtle Lawrence (wife), Forrest Lawrence Jr. (son). j. I certify that I have not been issued a Partial Pay Card (SandA Form 2), that I did not willfully destroy my pay record, and that my original pay record if subsequently found, will not be used to obtain additional money payments but will be delivered immediately to my Commanding Officer. Subscribed and sworn to before me this seventeenth day of September 1952. I have authority to administer Oaths. /s/ N. W. Burchard, Lt, USNR, which said oath was false in that said Lawrence had received advance pay to the amount of $240.00 dollars, and was then known by the said Lawrence to be false."

II

The defense before this Court has sought to moor its craft through the use of several anchors of argument. Among the least weighty is the contention that the specification erred fatally in purporting to set out *in haec verba* the affidavit of the accused, yet failing to allege that he had at any time signed the document. Were the accused charged with an offense other than the making of a false oath under the circumstances proscribed by Article 132(2)(B) of the Code, supra, this contention would possess greater cogency. That provision of the Code, however, speaks only of "making" an oath and contains no reference to subscribing the oath—provided, of course, a written document be involved. While a document as to which an oath is made will frequently be subscribed simultaneously, we are directed to no provision of Federal law which makes the taking of an oath depend for legal effect on a prior or contemporaneous subscription to any document or representation sworn to. Cf. Article 136 of the Code, 50 USC § 732. Nor does the applicable sample specification in the Manual for Courts-Martial, United States, 1951, contain a recommended allegation that the oath taken was accompanied by subscription. Moreover, the words "sworn and subscribed to" in the specification would give some notice to the accused that the Government's proof of the false oath would doubtless reflect that he had subscribed, as well as sworn to, the statement allegedly made for the purpose of opening a temporary pay record. While not necessarily controlling, it is to be observed that no objection to the pleading was raised at the trial level—where presumably counsel would have been able to ascertain whether the accused was in any way confused by omission of an express allegation that his signature appeared on the document charged as the vehicle of his false oath. The specification in the case at bar clearly was adequate to inform the accused of the particular false oath alleged to have been made, and to protect him from double jeopardy. United States v. Snyder, 1 US

631

CMA 423, 4 CMR 15; United States v. Marker, 1 USCMA 393, 3 CMR 127.

### III

The accused also complains that, although the specification charged the making of an oath on ▮▮▮ "knowledge and belief," its language alleged only that he "knew" that some of his statements were false, and not that he also "believed" them to be false. To state this argument is to reject it, since—within the context of normal parlance, and apart from philosophical inquiry into the relation between Faith and Reason —what a person "knows" to be untrue, he also "believes" to be untrue. Moreover, the word "false" in the specification tends to negate the possibility of a "belief" in the truth of the matter sworn to by the accused. Accordingly, we do not feel called upon to penalize the accuser's adherence to the sample specification in the Manual by adopting the distinction between knowledge and belief now advocated by appellate defense counsel. See Manual, supra, Appendix 6c, page 487, specification 109.

### IV

More plausible is the defense contention that the allegation of false swearing "for the purpose of ▮▮▮ opening a temporary pay record" did not suffice to allege a violation of Article 132(2)(B) of the Code, supra. The defense asserts that under Volume V, Manual of the Bureau of Supplies and Accounts, United States Navy—which was at the time of these events the authoritative source of Naval disbursement directives, and which is hereinafter mentioned as BUSANDA Manual—a temporary general Military Pay Record (DD Form 113) "will be opened . . . if the member's pay record has not been received by the 15th day following the date of his reporting." Paragraph 54468–1. According to this argument, executing an oath for the purpose of opening such a record reflects no more than an effort to comply with the requirements of the Navy Manual, and does not constitute an attempt to obtain payment of any claim. Establishment

of the temporary Military Pay Record — adds defense counsel — involved "purely an accounting procedure required to keep pay accounts in a current status," and a false oath "for the purpose of opening a temporary pay record" could not possibly suffice to fulfill the requirement of Article 132 (2)(B) to the effect that the false swearing be "for the purpose of obtaining the approval, allowance, or payment of any claim against the United States or any officer thereof."

Defense counsel's view that the accused is now being penalized because of his compliance with Navy Regulations does not persuade us. Actually whatever duties were imposed by the cited provision of BUSANDA Manual, were probably laid on Navy Disbursing and Finance personnel, rather than on the accused. Moreover, although the accused may have been required by BUSANDA Manual to furnish information for opening a temporary pay record, an implied term of the requirement must have been that he furnish accurate information. When, as alleged in the specification, he intentionally falsified the information necessary for the opening of a new pay record, he may not be deemed to have been merely seeking to comply with appropriate Navy Regulations. Consequently, he would not seem to be entitled to seek sanctuary therein. In short, despite the duty, if any, imposed upon the accused by BUSANDA Manual to furnish information relevant to his pay status, he remained free to elect between the giving of true information or of false. It is the manner in which he exercised that choice which constitutes the basis for criminal liability.

The argument that "opening a temporary pay record" is too remote from the payment, allowance, or ▮▮▮ approval of a claim to satisfy Article 132(2)(B), we must also reject. In United States v. Steele, 2 USCMA 379, 9 CMR 9, we declined a defense contention that preparation of a request for commutation of rations was unrelated to the "making" of a claim to support prosecution under Article 132(1)(A). Referring to the normal method of processing a

voucher for commutation of rations, we pointed out that the accused had done an act "which would start the claim in circulation in official channels." Similarly in the instant case, the accused was alleged to have taken steps which, for all practical purposes, operated to launch a claim in circulation—that claim being one for monthly pay without deductions. To support this assertion, we advert to the purpose for which temporary military pay records are authorized. Numerous servicemen must have been confronted by the problem of loss or non-availability of permanent pay records, due to reasons other than their own negligence or willful action. In the absence of a procedure for opening a temporary pay record, such an individual could not be paid, unless he fell into one of several very narrowly defined categories—e.g., a hospital evacuee from a combat area. See BUSANDA Manual, paragraph 54465.

The direction to open a temporary pay record upon lapse of a certain period, and failing arrival of a missing pay record, is a mandate to finance officers appropriately designed to counteract their notorious and entirely understandable hesitancy to make disbursements without clear authority for doing so—authority under which they will themselves be protected from financial responsibility. Actually the procedure for opening temporary pay records primarily benefits the serviceman whose records have been lost, and who would otherwise not be paid at the end of a proper pay period. The opening of such a record is, in most instances, an indispensable step in the payment of one whose records are missing or destroyed—in the accused's case, apparently the subject of destruction by fire. Manifestly, the affidavit of the accused was the principal action required on his part in the opening of a temporary pay record. See BUSANDA Manual, paragraph 54466, which prescribes a sworn statement as a condition to the initiation of a temporary pay record. In the normal course of events, and under the procedures prescribed by BUSANDA Manual, Lawrence would have had to take no other affirmative step to obtain compensation, following the opening of the temporary pay record—save perhaps to approach the pay table and to sign the payroll.

In light of our understanding of applicable Navy finance procedures, we consider that the allegation of the execution of a false oath for the purpose of opening a temporary pay record, by reasonable intendment and in the absence of defense objection, alleges a purpose to draw pay at the end of appropriate pay periods. There would exist no intervening step demanded of the accused in the drawing of such pay. Moreover, except in the unforeseeable event that his permanent pay records appeared, the opening of the temporary pay record would have led inexorably to the receipt of normal pay and allowances without deductions. Opening of the temporary pay record—itself conditioned on the making of a sworn statement by the accused—was the crucial action "which would start the claim in circulation in official channels." Scrutiny of BUSANDA Manual's provisions renders it certain that, in the absence of detection of accused's misrepresentation, he would sooner or later have collected compensation from the Navy to which he was not entitled. This is true for the reason that it is clearly envisaged that advance payments will be deducted subsequently from pay as it accrues for the purpose of liquidating the indebtedness created by the advance. Paragraph 54285–2b, BUSANDA Manual.

Actually, however, it is not necessary that we determine whether an improper payment to the accused would ever have resulted, or whether at any time, following the opening of the temporary pay record, he would have received Government funds to which he was not entitled. Article 132 (1) of the Code, supra, denounces the making or presentment of "false or fraudulent" claims—which terms are essentially indistinguishable. United States v. Ariola, 2 USCMA 637, 10 CMR 135. Article 132(2), however, proscribes various improper means which conceivably may be utilized in obtaining approval, allowance, or pay-

ment of claims. These means are denounced as illegal—as we construe the Code—irrespective of the ultimate justice of the claim itself. We infer that Congress apprehended that certain conduct, although pernicious, might be construed judicially to constitute mere "preparation" to make or present a false claim. Cf. United States v. Martin, 1 USCMA 674, 5 CMR 102. To avoid this result, such conduct was itself to be penalized when performed "for the purpose of obtaining payment, approval, or allowance of a claim"—this despite the fact that a false or fraudulent claim might never be "made or presented," and although the claim, allowance of which was sought, might be one to which no valid objection could exist, when established through use of proper means. Article 132(2), Uniform Code of Military Justice. Under this construction of the Code, a specification suffices if it alleges a false oath directed to obtaining pay for the accused, *regardless of his right to that pay upon proper proof.*

## V

The final defense argument also springs from an interpretation of certain paragraphs in BU-SANDA Manual. The term, "advance payment," is there used to denote a conscious and recognized payment of funds not yet earned; while the term, "overpaid," is used as a word of art to describe payments made *in error.* Paragraphs 53209, 54285, 54444, 56202. Accordingly, "advance payments" would not constitute "overpayments," when made in accord with appropriate directives—such as those permitting advances on the occasion of a permanent change of station. Defense counsel conclude that falsity was not alleged in the specification now under attack, since, in representing that he had no "overpaid balance," the accused made no representation whatsoever as to advance payments.

Unfortunately for the defense position, other sections of BUSANDA Manual use the term, "overpaid," in the more general sense of payment of moneys not actually earned. At one point,

for example, it is stated in paragraph 54631–1 h3:

"When installment liquidation of a payment which results in an amount *overpaid* is involved, the descriptive notation will include the amount and date the payment was made to the member as 'Adv/p $300 7/15' for *advance of pay."* [Emphasis supplied.]

See also paragraph 52109. Moreover, that the reference to "overpaid balance" was not intended to be limited narrowly is necessarily suggested by the context in which the accused made his representation here. The Navy would indeed have every prompting to wish to know of the obligation due its funds from a sailor whose temporary pay record was in course of preparation. From the information furnished by him for inclusion in the temporary pay record, the account to be collected ultimately could thus be determined and deductions made from the sailor's pay as it accrued. This is true regardless of whether the debt to be collected arose by reason of a prior—and lawful —advance payment or one made in error. We cannot believe that a rational person, in executing the oath set out in the specification, could fail to recognize the Navy's general purpose in seeking to secure information concerning the existence or non-existence of an "overpaid balance." From recognition of this purpose, a course of reasoning would lead by easy steps to the conclusion that the phrase "overpaid balance" must embrace any balance arising from a prior substantial advance payment. A sailor who had received such a payment would thus have been impelled to disregard any notion that, upon opening up a temporary pay record, the Navy intended to overlook information about possible prior advance payments. Perception would then have been quick that his statement concerning an "overpaid balance" must necessarily embrace a representation as to any balance arising from advance payments.

We recognize, naturally, that the latent ambiguity in the representation concerning "overpaid balance" does not conduce to clarity—a conclusion

634

which seemingly has also been reached by the Navy. See paragraph 54466, 2a, Item 11, Instruction Memo 23–20, May 8, 1953. Nevertheless, we cannot conclude that a specification is inadequate merely because the oath executed by the accused and alleged to have been false could—under a possible, if forced, interpretation of its purport—be reconciled with the facts known to the accused. Not all Government forms reflect the quintessence of lucidity. Yet if, in dealing with prosecutions for false swearing, official statements, or claims, we were required to scrutinize all constructions of a form or affidavit, alleged as the organ of falsity, for the purpose of determining whether each was consistent with the basic allegation of untruth, we might well in many instances cause criminal liability to hinge on whether the statement or oath in question was itself clear beyond reasonable doubt. Instead we must, ■ of course, examine the specification to determine whether—under a reasonable and plausible interpretation of the alleged false statement or oath—inconsistency exists as to the facts stated to have been known to the accused when he made the statement or executed the oath. Should the proof subsequently fail to show beyond a reasonable doubt that, as the accused understood the meaning of his statement or oath, it was irreconcilable with other facts known to him, the Government will simply have failed to establish the allegation of "falsity," which allegation demands proof of a deceitful intent. United States v. Ariola, supra. Under our view, possible ambi- guities in the allegedly false statement or oath must be subjects for consideration by the court-martial in determining whether, by reason of misunderstanding, the accused made a statement which at the time he genuinely believed to be true. On the other hand, a specification will not be regarded by us as defective merely because it does not on its face negative the possibility that there may have been such misunderstanding. Thus, the result will turn not on the pleading but on the proof, and the accused will in no way be precluded from contending before the court-martial that—by reason of misunderstanding—he did not consider he was misrepresenting any fact reflected in what he was saying, signing, or deposing.

As dictated by the foregoing considerations, we have concluded that the specification in the instant case is a valid one. Since argument was not presented concerning the sufficiency of the evidence, nor was the question raised through certification, we express no opinion thereon. Accordingly, we must remand to The Judge Advocate General, United States Navy, for reference to a board of review for further proceedings in conformity to the views expressed herein.

Chief Judge QUINN and Judge LATIMER concur.