UNITED STATES, Appellee

v

WILLIAM A. KELLEY, Boilerman Second Class,
U. S. Navy, Appellant

7 USCMA 584, 23 CMR 48

No. 8795

Decided February 15, 1957

*Commander Gay E. Milius, Jr.,* USNR, argued the cause for Appellant, Accused.

*Major Charles R. Larouche,* USMC, argued the cause for Appellee, United States. With him on the brief were *Commander Edmund Burke, Jr.,* USN, and *Lieutenant Commander Robert R. Marsh,* USNR.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by a special court-martial of a $5.00 larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to a bad-conduct discharge, partial forfeitures, reduction in grade, and confinement at hard labor for three months. The convening authority approved the findings but only that portion of the sentence adjudging a bad-conduct discharge. Thereafter, the officer exercising general court-martial jurisdiction and the board of review affirmed the findings and the sentence. The issues before us now are:

(a) Whether interrogation of the accused without warning by one acting in an official capacity, when the accused was a suspect, violated Article 31, Uniform Code of Military Justice;

(b) Whether the introduction of inadmissible evidence of other misconduct not charged prejudiced the substantial rights of the accused.

The larceny alleged in this case occurred on board a naval vessel, the USS SEMINOLE. Machinist Mate Third Class Kakouris, in reply to a question by a court member, declared that the night before the alleged theft he observed the accused, after the latter's return aboard from liberty, going through a shipmate's trouser pockets. Following this, Kakouris, in company with two other sailors, devised a scheme to catch the accused in an act of thievery. Pursuant to this scheme, Boilerman Second Class May removed all currency from his wallet except a $5.00 bill in military script and three hundred yen. The serial number of the bill was copied and the wallet placed in May's open locker. A watch was to be maintained throughout the night in order to catch the culprit, but Morpheus overcame the detective zeal and by 3:15 in the morning all had fallen asleep. Later that morning, upon discovery that the wallet

and contents were missing, the theft was reported to the ship's authorities.

Chief Gunner's Mate Boyd, acting Master at Arms—and alerted to the larceny—stopped the accused from going ashore and requested his wallet. An examination thereof disclosed the missing script. Boyd gives the following account of the incident:

"Well, it was around 0830 or 0900, I guess, it was May who came up to me and asked me if I would search Kelley when he started to go ashore, they suspected him of taking some money. They had a paper that they had written a serial number on and told me that that was the money that was marked and that was the stolen money. So about 1030 when they called away the liberty party, I went out to the gang way and Kelley was getting ready to go ashore and had checked out on the liberty list. I asked him if I could check his wallet, check the money in it, and he said yes and handed it to me. I looked in his wallet and he had a five dollar bill, MPC and two or three peso notes.

. . . . . . .

". . . Gehrig was standing by the gangway and getting ready to go ashore at the time, so I called him over and asked him if he had loaned Kelley the money and he said yes. Then at that time I asked him if he knew that was stolen money and he said no. Then he started changing his story that he did not loan Kelley the money. At that time, Kelley then said that he had the money for two or three days."

Continued in the record is the following question and answer:

"Q. Who is he Chief? Who had the money for two or three days?

"A. Kelley, and at that time I called Bowen, May and Bishop. They were standing there watching me and I showed them the money and they

586

said that that was the money that was stolen."

Gehrig testified at the trial that he had loaned the accused $5.00 but the day preceding the theft, the accused had repaid the loan. The accused testified that he had borrowed $5.00 from Gehrig and had gone ashore with a total of $10.00. He returned to the vessel with $5.00, which he repaid to Gehrig. The following morning he borrowed $10.00 each from two shipmates.

According to the accused, during the evening preceding the theft he returned to the ship, took a flashlight from under his bunk, got a drink of water and returned to his bunk area. While undressing, his wallet dropped from his trousers and after retrieving it he placed it on the side of his bunk. At that time he had $5.00 in his trousers. He went to bed and did not arise until morning. Later, while starting ashore, he was stopped by Boyd who asked him for his wallet.

The case was poorly tried. An inordinate amount of inadmissible evidence was received into evidence and the defense counsel hardly raised a pertinent objection throughout the proceedings. In answer to a question by a court member, witness Kakouris explained:

"A. Well, the night before I was in my pad about 1130. It was hot and I could not sleep. I was up on deck previously. The liberty boat came back and it was noisy so I could not sleep, and I noticed W. A. Kelley came back and I had reason to take particular notice of Kelley from things that I had heard, and he went back to where his rack was and came back up forward and started taking his jumper off. He shined his flash light on Gietler's rack and then came up toward the scuttle-butt toward my rack, got a drink of water and came back by my pad and it looked like he was feeling the pockets. He stood there for about 30 seconds, then looked in both directions, and then I saw him go through a pair of pants. He came back towards my rack to a row of lockers, started from the top locker on the outboard side, aft. The lock on the lockers was locked on the three lockers and then he turned to the next locker which was McNally's locker. The locker was unlocked and he was attempting to look through the locker. I saw him open the top drawer and heard the rustling of paper. I can't say which one was first, but he opened both drawers. He closed both doors again and went back to his rack."

Subsequently, witness Bishop, in answer to a question by a member of the court, asserted:

"A. Well, I was told by Kakouris what he had seen the night before. That is the reason we timed it when we did, but I have been suspicious of Kelley before by his habits. I seen him up out of his rack at times. Once before some of my money was missing and he asked me to go ashore with him. I told him no, I could not I had been robbed. By his actions then, he acted guilty about it. It was by suspicion, I did not have anything to back it up, but one night I seen him looking in another man's pants."

The first problem before us is whether the accused should have been warned prior to being questioned by Boyd. Even assuming that Boyd was justified in stopping and searching the accused before he left the ship, he was not afterward justified in questioning the accused without first advising him of his rights under Article 31 of the Uniform Code of Military Justice, 10 USC § 831. The Government argues that the accused's replies were exculpatory and since Article 31(d) refers to incriminating statements, the Article is here inapplicable. We do not agree with that argument. Kelley was questioned by a superior as to where he had obtained the money. Since he had not been warned, he was called upon to give some type of a logical explanation to account for the money being discovered on his person. When he stated that he had borrowed the money from Gehrig, he was immediately confronted with that individual who, after being impliedly threatened, denied the loan.

The Government next reasons that

**587**

even though the accused's "total statement" was incriminatory, it was merely an admission—not a confession—and hence an affirmative showing of voluntariness and warning under Article 31 was not required. See United States v Seymour, 3 USCMA 401, 12 CMR 157, and United States v Josey, 3 USCMA 767, 14 CMR 185.

Article 31(b) provides, "No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of. the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial." Article 31(d) declares, "No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence or unlawful inducement shall be received in evidence against him in a trial by court-martial." There is nothing ambiguous about these Code provisions. A statement was here requested by a person subject to the Code and directed toward "a person suspected of an offense" without first informing that individual as to the nature of the accusation against him and without advising him that he would not have to make any statement and if he did make a statement that it could be used against him in a trial by court-martial. Article 31 was therefore violated. Since Article 31 represents the law under which this Court and the Armed Forces operate, it is controlling and nothing in the Manual can whittle away the substantive protections given by it to an accused. Any evidence obtained in violation of Article 31 is inadmissible. The President may, under Article 36(a) of the Code, 10 USC § 836, prescribe "procedure, including modes of proof, in cases before courts-martial." But promulgation of procedure and modes of proof cannot delete or restrict substantive rights given an accused under the Code. When during a trial—whether an admission or confession—it is perfectly obvious

that a statement has been secured in violation of Article 31, it should not be admitted. True, in a general court-martial, an accused, defended by a competent lawyer, may affirmatively waive his rights under Article 31, but such waiver should not be applied in a special court-martial, such as here, when the accused is represented by a nonlawyer who lacks the legal knowledge required to adequately protect the rights of his client. We have never stated that the rule with respect to waiver is inflexible. Ordinarily one must understand his right to object and indicate in some appropriate manner a desire to refrain from asserting that right. United States v Vanderpool, 4 USCMA 561, 16 CMR 135. In the past, this Court has been loathe to enforce waiver in special court-martial cases. United States v Moore, 4 USCMA 675, 16 CMR 249; United States v Beer, 6 USCMA 180, 185, 19 CMR 306, 311. Under the circumstances of this case, we hold that the accused did not waive his Article 31 protections. The violation thereof is reversible error.

Another question raised is whether admission into evidence of the prior acts of misconduct prejudiced the accused. Witness Kakouris, in answer to a question propounded by a court member, recounted how—the night preceding the theft—he had observed the accused rummaging through trousers and tampering with lockers belonging to shipmates. After this testimony, the accused took the stand and attempted to explain his prior behavior. Thereupon Kakouris was again called to the stand in rebuttal and once again reiterated his testimony of the prior misconduct. Then witness Bishop was interrogated by the court along the same lines and testified that he had been suspicious of the accused for a long time because he "seen him up out of his rack at times. Once before some of my money was missing and he asked me to go ashore with him. I told him no . . . I had been robbed. By his actions then, he acted guilty about it. It was by suspicion, I did not have anything to back it up, but one night I seen him looking

in another man's pants." No objection to this testimony was lodged by the defense nor were any limiting instructions subsequently given by the president of the court. Even assuming Kakouris' direct testimony might have been construed as showing a course of criminal conduct, patently Bishop's testimony was inadmissible under any test. According to the witness himself it was based on suspicion and conjecture. Moreover, no date was designated as to when this witness had seen the accused "looking in another man's pants."

In Coulston v United States, 51 F 2d 178 (CA 10th Cir) (1931) the defendant was convicted of violating the Federal Anti-Narcotic Acts. On cross-examination he was questioned about other sales of morphine, one occurring some thirteen months prior to the trial. According to the court,

". . . Neither of the transactions proven on rebuttal had the slightest connection with the sale for which defendant was being tried.

"In our judgment, this was prejudicial error. The issue presented was a simple one: Did defendant negotiate the sale . . . as testified to by two government witnesses, or was he an innocent bystander, as he testified. These remote and disconnected transactions had no evidentiary bearing on this issue; at best they could serve but to create an atmosphere of hostility and to distract the attention of the jury from the issue."

This Court reiterated the general rule in United States v Yerger, 1 USCMA 288, 3 CMR 22:

"The rule has long been established that evidence of other misconduct is generally not admissible against an accused. This is so, since proof of other crime, collateral to the issues in the instant case, supplies no legal presumption or inference relevant to the offenses charged. Such proof can only tend to prejudice the court against the accused, divert their minds from the real issues, and produce an impression that the accused is guilty because he has previously demonstrated a criminal tendency. See Boyd v. United States, 142 US 450, 35 L ed 1077, 12 S Ct 292; Coulston v. United States, 51 F 2d 178 (CA 10th Cir).

"This general rule is, of course, subject to several well-defined and closely restricted exceptions. For example, evidence of prior misconduct is sometimes admissible to show the bad character of the accused where it has been placed in issue by the defense, or to show a course of criminal conduct where such conduct has a definite relationship to one of the elements of the offense charged. Wigmore on Evidence, 3rd Ed., §§ 58, 306; Wharton, Criminal Evidence, § 345. Neither of these exceptions is applicable here. Defense had not placed petitioner's good character in issue, and the prior offenses proven were entirely unrelated to the offenses charged."

It is clear that before a similar offense can be used there must be a reasonably close connection in point of time as well as a "definite relationship to one of the elements of the offense charged." In the instant case, Bishop's testimony was more in the nature of gossip than the recitation of relevant facts. It was not linked up in point of time and was filled with conjecture and hearsay. Its admission into evidence was error and could have reasonably affected the court's finding. The accused is not required to discover through exploration of the court members' mental processes that the error did in fact influence them. It is enough if there is a reasonable possibility that it did. Little v United States, 73 F 2d 861, 866 (CA 10th Cir) (1934).

In addition to the violation of Article 31 and the receipt of inadmissible evidence, the record discloses an utter disregard of basic procedure and applicable rules of evidence. Frequent leading questions were asked by the trial counsel and all manner of hearsay evidence was received. We must conclude here, as we did in United States v Yerger, supra, that:

"... Separate consideration of the numerous instances of these errors is unnecessary and would unduly extend this opinion. Suffice it to say that the record demonstrates a flagrant disregard for elementary rules of evidence. Isolated and minor errors in receiving hearsay testimony and using leading questions appear in many criminal trials, both civilian and military, and ordinarily such deviations from proper procedure would not be substantially prejudicial and hence would not concern us as an appellate court. 'We must guard against the magnification on appeal of instances which were of little importance in their setting.' Glasser v. United States, 315 US 60, 83, 86 L ed 680, 706, 62 S Ct 457. But such is not the situation here. Repeated violations of fundamental rules of evidence, conceived at least partially for the protection of the accused, cannot be condoned.

"The cumulative effect of the errors discussed above, each prejudicial inherently and in fact to a greater or lesser degree, requires that we set aside the findings in this case. United States v. Donnelly, 179 F 2d 227, 233 (CA 7th Cir); United States v. Wicoff, 187 F 2d 886, 891 (CA 7th Cir). In the words of Mr. Justice Rutledge, we '. . . cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, . . .' Kotteakos v. United States, 328 US 750, 765, 90 L ed 1557, 66 S Ct 1239. Error is clear; prejudice exists."

The decision of the board of review is reversed and the record is returned to The Judge Advocate General of the Navy for a rehearing or such other proceedings not inconsistent with this opinion.

Chief Judge QUINN concurs.

Judge LATIMER concurs in the result.