UNITED STATES, Appellee

v

STANLEY M. WARD, Specialist Five,
U. S. Army, Appellant

14 USCMA 3, 33 CMR 215

No. 16,315

May 10, 1963

*Captain Bruce C. Johnson* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod, Captain Richard A. Baenen,* and *Captain Thomas Stapleton.*

*First Lieutenant Robert E. Shepherd, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

### I

Arraigned before a general court-martial, accused pleaded not guilty to two specifications involving the making and use of false papers in support of claims against the United States, violative of Article 132, Uniform Code of Military Justice, 10 USC § 932. Upon consideration of the evidence, the court convicted him as charged, and imposed a sentence of bad-conduct discharge, total forfeitures, confinement at hard labor for two years, and reduction in grade. The findings and sentence have been affirmed upon review at intermediate levels, except that the board of review reduced the period of confinement to one year.[1]

Thereafter, this Court granted ac-cused's petition for review in order to consider three issues. The first two deal with an alleged violation of Article 31, Uniform Code of Military Justice, 10 USC § 831; the remaining question concerns the sufficiency of the evidence. The issues will be set out in the course of our discussion. Before launching into those inquiries, however, a rather extensive development of the facts is deemed appropriate to a proper understanding of the questions.

### II

Both offenses arise out of accused's claim for parachute jump pay. He was stationed at Fort Bragg, North Carolina, but, from June through August 26, 1961, he was on temporary duty at Fort McClellan, Alabama. He needed

---

[1] By subsequent action, the Secretary of the Army ordered accused's assignment to a retraining program. It was directed that, effective upon successful completion of a required period of training, the unexecuted portion of accused's sentence be suspended and that he be restored to duty to complete his term of service under his current enlistment.

4

a parachute jump in order to qualify for extra pay for the period August, September, and October, but the facts indicate he was unable to arrange one. Accused did, however, prepare a false jump manifest, a DA Form 1306, reflecting that he and two other soldiers had jumped at Fort Benning, Georgia, on August 7, 1961. The record specifically reflects that such jump was not made. Accused, however, received $55.00 per month jump pay for August, September, and October 1961, based on the alleged parachute jump of August 7th. The circumstances under which, on November 15, 1961, accused submitted a manifest concerning this jump to a finance clerk will be set forth separately, later in this opinion. We note at this point that, according to the evidence, about five weeks later, shortly before Christmas, accused contacted one of the soldiers listed on the August 7th manifest regarding the incident. Accused at that time advised him to "forget it," and not say anything if questioned about "The deal at Fort McClellan."

After his return from Fort McClellan, and during late October or about November 1, 1961, accused approached another soldier, one Mills. The latter replied in the affirmative when accused asked if he needed a jump for pay purposes. Subsequently, at accused's instruction, this soldier went to accused's car, from which he obtained two jump manifests. It would appear they were partially filled in, and Mills testified accused added his name to accused's own, which was already listed thereon. He further stated he noticed that the purported certifying signature of a Captain Sharp had been affixed as jumpmaster. Thus completed, the manifest indicated the pair had made a parachute jump at Fort Bragg on November 1, 1961. When Mills later asked when the jump was to be made, accused told him to "forget it." The record shows this jump was not made, and Sharp denied signing such a manifest or authorizing his signature, or jumping or acting as jumpmaster on that date. Accused turned in to finance one of the manifests above described and thereafter

received extra pay for November based on this alleged jump. The evidence also shows that, around the middle of December, accused contacted finance and inquired as to possibly returning the money he had been paid for this alleged jump, and whether "there was any way" the clerk could "not post the jump for December."

One Stubli, the finance clerk for accused's unit, testified that jump manifests are to be certified after the parachute jumps are completed. Those documents show the date, place, and nature of the jumps, and list the persons making the same. Such manifests are used, for finance purposes, to credit enlisted personnel for the $55.00 monthly extra pay to which the jump entitles them during the quarterly period covered. In order for finance to post jump pay on a man's pay record, either such a jump manifest or the soldier's individual jump log is required.

The specifications upon which accused stands convicted aver that he filed the manifest as to the purported November jump on November 5, 1961; and that the manifest regarding the earlier jump, allegedly made in August, was submitted on November 15, 1961. The circumstances of the latter transaction are important to the issues before us.

For some reason, accused's pay records had apparently been screened by criminal investigators "The first part of November." They apprised the pay clerk, Stubli, and his superior, that the manifest indicating accused jumped on August 7th, which supported the extra pay for August, September, and October, was missing. Thereupon the clerk was called in by his superior, and the pair went through accused's file. They verified that, although an August 7th jump had been posted on accused's pay record, the supporting manifest indeed was not there, as it should have been. Stubli desired a copy of the manifest so as to substantiate the accused's records for pay purposes. Therefore, he obtained his superior's permission to contact accused and find out whether the latter had a copy of

**5**

the manifest for use in the records. The pay clerk did so and, on November 15th, accused brought in a copy of the August 7th document. Stubli pointed out that it was unsigned by the jumpmaster or other certifying officer and that, absent the required certification by one of those individuals, he could not accept the manifest. Accused thereupon signed the document, which already bore his typed name as jumpmaster, and turned it over to the finance clerk.

It was elicited from Stubli that he at no time warned accused in accordance with Article 31 of the Code, supra. Further, the clerk admitted that, at the time he requested and secured the jump manifest from accused, both he and his superior suspected accused of "committing an offense." At no time, however, was the nature of this "suspicion" ever pinpointed and, when asked, Stubli specifically and categorically denied that he suspected accused of submitting a false claim or manifest on the alleged August 7th jump.

The clerk denied acting as an agent of criminal investigators, or at their behest; that his action in contacting accused was at his superior's direction; or that he was investigating or seeking evidence. To the contrary, he stated that jump manifests are required by regulations. The August 7th manifest was missing; he didn't know where it was, and needed the document for the pay records to substantiate them and bring them up to date. It was "standard procedure" to contact the individuals when documents were missing, and Stubli had done this on several prior occasions, strictly for pay purposes. He needed it for proper posting of accused's records. Had the latter not had a copy, the ordinary course would be for Stubli to contact the post where the jump was allegedly made for verification.

With regard to this matter, the finance clerk remembered that, when accused returned to Fort Bragg from temporary duty around September 1st, the purported jump of August 7th was posted on the fifth, or "working," copy of accused's pay record, which ac-

cused had hand carried. It was already posted and, in order to do that, a jump manifest or other record is required. Thus, when Stubli later noted that the August 7th manifest was missing, he assumed someone had posted accused's pay record and the supporting manifest was lost or misplaced. He did not know who posted it but, to the best of his knowledge, such posting was correct.

When the prosecution offered the August 7th manifest in evidence as an exhibit, accused's individual military defense counsel interposed an objection. The defense argued that "It is in violation of Article 31 on self-incrimination" and that, in view of Stubli's suspicions, "this was just a scheme to trap Ward to produce this document." The law officer overruled the objection and received the manifest in evidence. Subsequently, when instructing the court members on the merits, he did not submit any Article 31 question to them.

### III

The first two assignments of error upon which this Court granted review may conveniently be treated together. They inquire:

Whether accused was prejudiced by introduction of evidence taken in violation of Article 31; and,

Whether the law officer erred by failing to submit the Article 31 problem to the court for factual determination.

Patently, the first issue must be decided adversely to accused. The question posed concerns a simple interlocutory ruling, and it is clear from the facts recited that the law officer did not abuse his discretion in admitting the August 7th manifest in evidence.

The instructional issue is more difficult of resolution. It involves Stubli's "suspicions," and it is true the law officer did not instruct the triers of fact as to Article 31. Were such issue present in the case, there can be no doubt he would be obliged to give

advice thereon to the court members in order that they might consider the question in their deliberations. United States v Gorko, 12 USCMA 624, 31 CMR 210. The law officer's failure to do so, however, is not at all the crux of the matter, for we must determine whether the evidence reasonably raised any such "Article 31 problem"—a matter, we note, that the defense presupposes in this assignment.

As we have earlier seen, Stubli and his superior, the finance officer, indeed suspected accused of "committing an offense"; and Stubli thereafter contacted accused to obtain a copy of the missing manifest. While the specific nature of his suspicion was not elicited from the pay clerk, that is of no consequence. It is unimportant whether it was entitlement to extra compensation under the other manifest covering the November-January period, which accused had previously filed, or some other aspect of accused's pay record that had been questioned. We may assume, *arguendo*, for the purpose of this case, that accused was indeed suspected of some pay irregularity as to the alleged August 7th jump.

Even so, the specification with which we are here concerned alleges—and the proof corresponds— ▌ that accused submitted the false document to Stubli and thereby committed the offense *after* his conversation with the clerk. Obviously, at the time Stubli contacted accused the finance clerk and his superior officer could not have suspected accused of the November 15th offense, which had not as yet been committed. Neither, certainly, under those circumstances, was it possible for them to inform accused of the nature of such accusation. See United States v Nitschke, 12 USCMA 489, 31 CMR 75; United States v Haskins, 11 USCMA 365, 29 CMR 181; United States v Davis, 8 USCMA 196, 24 CMR 6; United States v O'Brien, 3 USCMA 325, 12 CMR 81. Nor could they have advised him that he did not have to make any statement regarding an offense of which he was accused or suspected, not then being accused or suspected. Manifestly, the case at bar is to be distinguished from such cases as United States v Gorko, supra; United States v Souder, 11 USCMA 59, 28 CMR 283; United States v Doyle, 9 USCMA 302, 26 CMR 82; and United States v Nowling, 9 USCMA 100, 25 CMR 362. Unlike the present instance, in those cases the issue was as to suspicion attached regarding offenses already committed at the time inquiry was made of the accused. That is not so here.

If anything, the real issue raised in this case by Stubli's testimony was one of entrapment. Thus, ▌ as indicated earlier herein, the defense itself urged to the law officer that this was "a scheme to trap Ward to produce this document." So, too, in his closing argument to the court members on the merits, defense counsel asserted that Stubli entrapped accused, and urged that defense in behalf of his client. It is to be noted that such action was wholly consistent with what had taken place prior to summations in an out-of-court hearing on instructions. Thereat, the law officer had indicated the facts seemed to raise an issue of entrapment. Over the prosecution's objection, and with the individual defense counsel's acquiescence, the law officer stated he would instruct thereon. The defense indicated its agreement with that action and, after the law officer had given his instructions to the triers of fact in open court— including advice on entrapment but not Article 31—the defense stated its satisfaction with the instructions and requested no others.

There can be no doubt, therefore, that the only issue which may have been reasonably raised by Stubli's testimony was submitted to the court for its determination. The law officer's advice properly submitted the theory of the case from the standpoint of the defense and adequately protected all the rights of the accused.

For these reasons, the second assigned error is rejected.

### IV

The final issue upon which we

elected to hear arguments requires determination of:

Whether the evidence is sufficient to show that the accused made and used a paper to obtain approval, allowance, or payment of a claim when such paper was made and used on November 15, 1961, to cover payments previously received by this accused in August, September, and October 1961.

The specification as to which this question relates alleges that, on November 15, 1961, accused made and used the false August 7th jump manifest "for the purpose of obtaining the approval, allowance, and payment of a claim against the United States in the amount of $165." As we have previously noted, accused had, at the time of this offense, already received $55.00 per month extra pay for August, September, and October, based on the alleged August 7th parachute jump.

In short, the argument urged upon us by appellate defense counsel is that approval, allowance, and payment of this claim had taken place prior to the time accused presented the false manifest on November 15th. Thus, they contend that he could not, on the subsequent occasion, have submitted the manifest "for the purpose of approval, allowance, and payment" and, while his actions may have violated Article 107, Uniform Code of Military Justice, 10 USC § 907, accused certainly did not commit the Article 132 offense alleged in the specification.

In response, the Government urges that, until verification of the purported parachute jump of August 7th was properly filed, no obligation or debt accrued against the United States; the mere transfer of money does not constitute "payment" in the absence of a valid obligation and, therefore, no "payment" of this premium to accused had been made. Rather, he merely received an erroneous overpay, and the Government would, absent submission of the proper documents for "approval, allowance, and payment" of such a claim, recoup the amount from accused. Had the manifest not been filed to substantiate the jump, final

confirmation of the extra pay would be disallowed, and recoupment would follow.

We may appropriately forego explicit consideration of the impact of 5 USC § 46d; 10 USC § 4837; or other statutes and finance regulations. See, for example, 5 USC § 46e; and Army Regulations 37–104, Chapter 13. Pretermitting those questions, █ Article 132(2)(A), Uniform Code of Military Justice, supra, upon which this prosecution was based, outlaws deliberate making or use of false documents "for the purpose of obtaining the approval, allowance, or payment" of a claim (emphasis supplied). The statutory proscription is in the disjunctive, and the offense is equally made out whether the purpose of the perpetrator be to obtain approval, allowance, or payment of a claim, or all three.

It is abundantly clear from the facts recounted hereinbefore that, regardless of whether accused's █ receipt of $55.00 per month in August, September, and October constituted technical "payment" within the terms of Article 132, a properly filed jump manifest was required to perfect this extra entitlement. Absent such verification of the jump, the finance records were unsubstantiated and incomplete. The incentive payment clearly would be disapproved without the manifest, and the facts of the present case support a finding that accused submitted the same to prevent its disallowance.

The specification involved, the law officer's instructions, and the findings returned by the court members, all contained approval, allowance, *and* payment, in the conjunctive. Clearly, therefore, the court-martial expressly concluded accused made and used the false manifest, on November 15, 1961, for the purpose of approval and allowance of the $165.00 claim, and the finding of "payment" is surplusage to a valid conviction for fraud against the Government.

The final issue, therefore, must be resolved adversely to accused.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I regret to see my brothers adopt the position which they take in this case, for I believe it entirely overlooks the basic legal proposition involved; construes the evidence in the transcript too strictly; and resolves the problems presented on the basis of a theory clearly erected by the Government on appeal in defiance of the uncontradicted testimony of its own witness.

Thus, it is declared that there was no duty to advise the accused of his rights under Uniform Code of Military Justice, Article 31, 10 USC § 831, because he did not commit the offense charged in specification 1 of the Charge until he presented Specialist Stubli with the jump manifest involved here on November 15. In substance, this is said to be true because it was necessary for accused to present the voucher on November 15, as his earlier receipt of parachute pay was again in question.

My position with regard to this rationale may be shortly stated. There is not a shred of testimony in the record to support any inference of a threatened recoupment of accused's parachute pay. To the contrary, taken in the light most favorable to the Government, Stubli's testimony indicates that he asked accused only for *a copy of a lost voucher which had been filed and acted upon months earlier but which Stubli desired to complete his records.* As a judge, I cannot disregard these facts in order to avoid the consequences which flow from them.

Moreover, even assuming that accused "committed the offense *after* his conversation with the clerk," an issue would still arise concerning the need to warn him of his rights under Code, supra, Article 31, for that statute forbids the receipt in evidence of *any* statement obtained in violation of its terms—quite without regard to whether its making constitutes a "new" offense under the Code. United States v Morrison, 10 USCMA 525, 28 CMR 91; United States v Price, 7 USCMA 590, 23 CMR 54; United States v Kelley, 7 USCMA 584, 23 CMR 48.

The accused was convicted of two specifications of making and using false jump manifests for the purpose of obtaining approval, allowance, and payment of two claims for parachute pay, in violation of Code, supra, Article 132, 10 USC § 932.

Basically, the record reflects that, on August 9, 1961, accused gave to a Private First Class Ellis a copy of a jump manifest, signed by himself as jumpmaster and purporting to certify that Ellis, Ward, and a Sergeant First Class Chadwick had made parachute jumps on August 7, 1961, at Fort Benning, Georgia. The manifest was false, but, if true, would have entitled each man named therein to receive parachute pay for the months of August, September, and October 1961.

By September 1, 1961, the accused had presented the jump manifest to finance personnel, for it was listed "on the 5th copy, which is the work copy of his finance records" when he returned to his home station. It was not the "practice to make entries on an official pay record without checking the jump manifest." On September 1, Specialist Strubli, the finance clerk involved here, posted Ward's entitlement to parachute pay for the months of August, September, and October to his pay record. Ward accordingly received the additional emolument during those months. According to Stubli, it was not "necessary for the unit to maintain a manifest in it's [sic] records to substantiate a jump posted to a man's pay record."

On November 5, 1961, accused filed another jump manifest which falsely reflected that he had made a parachute jump on November 1, 1961, at Fort Bragg, North Carolina. The manifest also contained the name of a Private Mills and was purportedly certified by a Captain Sharp. Mills observed accused fill out the voucher but heard nothing further about it until he "was called in by the CID."

**9**

In the "first part of November" the Criminal Investigations Detachment "examined Ward's pay record." Stubli was "aware . . . that they were searching his records" and "knew he was suspected of an offense." Moreover, his superior, Mr. Campbell, "knew that Ward was suspected of committing an offense." Stubli and Mr. Campbell were "directed to examine Ward's payroll." The criminal investigators told Stubli that "the [August 7th] manifest was missing" and, with Mr. Campbell's permission, Stubli "contacted Specialist Ward [by] telephone and asked him if he had *a copy of the jump manifest.*" (Emphasis supplied.) Ward "came up to the office later on and presented one to me." The copy was unsigned and, at Stubli's request, accused affixed his signature thereto. At no time did Stubli advise the accused of his rights under Code, supra, Article 31, as, while he suspected him of an offense, he did not suspect him "of submitting a false claim on the 7 August jump or a false manifest."

There is other testimony by Stubli which indicates that he may have wished the manifest copy only for record purposes rather than as evidence of accused's crime. Hence, the principal opinion is correct in its conclusion that the copy was not inadmissible as a matter of law. In my opinion, however, the evidence does raise an issue concerning whether Stubli suspected accused of filing a false jump manifest on or about September 1, 1961, and, such manifest having unaccountably disappeared, sought to obtain a copy from the accused as proof that he had committed that offense. Under such circumstances, it is clear that a duty to advise accused of his rights would arise. United States v Nowling, 9 USCMA 100, 25 CMR 362; United States v Holmes, 6 USCMA 151, 19 CMR 277; United States v Rosato, 3 USCMA 143, 11 CMR 143. And where an issue is raised whether such suspicion exists, it is incumbent upon the law officer to submit the question to the court members with appropriate instructions. United States v Gorko, 12 USCMA 624, 31 CMR 210.

Examination of Stubli's testimony as a whole indicates the fact finders might reasonably infer that he suspected accused of filing a false jump manifest in connection with the purported jump on August 7th. At the outset, I note that he specifically denied such suspicion, but we have heretofore held such denial neither binding on the court-martial nor this Court. Thus, in United States v Doyle, 9 USCMA 302, 26 CMR 82, where a witness similarly denied suspecting the accused, we declared, at page 309:

". . . Either the two officers misunderstood what is meant by the phrase 'suspected of an offense' or their testimony must be characterized as impossible of belief. Trial defense counsel did not examine the witnesses on their understanding of the words, but they must have been using a yardstick unknown to us, *for we cannot believe this intensive course of investigation with its many ramifications could start and proceed to the employment of an Office of Naval Investigations special investigator with the first two important interrogators not suspecting irregularities on the part of the accused.*" [Emphasis supplied.]

In like manner, Stubli here testified that criminal investigators were searching accused's finance records during the first part of November. It takes no great intellectual force to discern that they were engaged in checking on the validity of his entitlement to parachute pay—probably in connection with the November 5th voucher—for it was these military detectives who, in examining the jump manifest files, discovered that the August 7th manifest was missing. Stubli admittedly suspected accused of an "offense" because of this criminal investigation and, as the latter was being conducted amidst the records and papers of his office, the fact finders would surely be entitled to infer that he was also suspected of a crime having to do with his pay and allowances. Moreover, having his attention directed to the absence of the August 7th voucher *by the detectives,* it would seem likewise that the jury

might properly having reasoned that the inexplicable absence of this document cast doubt upon Ward's entitlement to the parachute pay which it purportedly justified. Indeed, it almost defies belief to conclude that either an astute Personnel Officer or his Finance Clerk would not suspect Ward when:

a. They knew Ward's pay and allowances were being looked into by criminal investigators;

b. The investigators had been examining jump vouchers and had discovered an earlier paid voucher to be unaccountably missing; and

c. That the detectives were sufficiently interested to bring the matter to their attention in connection with the screening of accused's records.

To me, the basis for an inference of suspicion is clearly present. Compare United States v Doyle, supra; United States v Hopkins, 7 USCMA 519, 22 CMR 309; and United States v Souder, 11 USCMA 59, 28 CMR 283. And, inferentially, I believe my brothers admit such to be the case, for they seek to escape the telling effect of the evidence recited above only by the assertion that the accused had not then committed the offense charged against him and, in fact, did not do so until, at Stubli's request, he produced and signed the copy.

Unlike them, I am unable to discover a single bit of evidence in this record which tends to establish the making and use of a false paper in connection with a false claim on or about November 15, 1961, as charged in this case. Rather, under the most liberal construction of the evidence presented, it is crystal clear that the accused made and used the August 7th manifest on or about September 1, 1961, in connection with his claim for parachute pay for the months of August, September, and October. Indeed, he actually received payment for those months and his alleged August jump was posted to his pay record on September 1 by Specialist Stubli himself. The evidence likewise makes it clear that this voucher disappeared from the files, and Stubli conceded it "could have been . . . lost or misplaced." Moreover, time and time again, he emphasized in his testimony that he was not seeking this original voucher but a *copy* which he thought accused might have retained in his possession. Nowhere in the record does it appear that he was attempting to have the accused produce new evidence to sustain his eligibility to retain the payments which the latter had already received. To the contrary, in line with his testimony regarding his lack of suspicion, Stubli insisted he wanted the document only to complete his files and that he had made such routine requests of other soldiers on other occasions.

In sum, this is not a case of an attempt on the part of military authorities to recoup an apparently unauthorized payment with the accused coming forward with new, albeit false, evidence in an effort to forestall such action. Rather, at the most, it is the request for production—for the sake of convenience to the Army—of *a copy* of a voucher filed several months before. In my opinion, merely giving the military authorities a copy, at their request, of a document already so filed with them does not constitute the offense of making and using a false paper in connection with a claim against the United States. It is no more than evidence of the making and using of the false document on the earlier occasion.

Code, supra, Article 132, with respect to the specific offense with which accused is charged, provides pertinently:

"Any person subject to this chapter—

. . . . .

(2) who, *for the purpose of obtaining the approval, allowance, or payment of any claim against the United States or any officer thereof*—

(A) makes or uses any writing or other paper knowing it to contain any false or fraudulent statements;

. . . . .

shall, upon conviction, be punished

as a court-martial may direct." [Emphasis supplied.]

In United States v Lawrence, 3 USCMA 628, 14 CMR 46, we had occasion to construe the foregoing provision. Of it, we said, at page 633:

". . . Article 132(2), however, proscribes various improper means which conceivably may be utilized in obtaining approval, allowance, or payment of claims. These means are denounced as illegal—as we construe the Code—irrespective of the ultimate justice of the claim itself. We infer that Congress apprehended that certain conduct, although pernicious, might be construed judicially to constitute mere 'preparation' to make or present a false claim. Cf. United States v Martin, 1 USCMA 674, 5 CMR 102. *To avoid this result, such conduct was itself to be penalized when performed 'for the purpose of obtaining payment, approval, or allowance of a claim'—this despite the fact that a false or fraudulent claim might never be 'made or presented,' and although the claim, allowance of which was sought, might be one to which no valid objection could exist, when established through use of proper means. Article 132 (2), Uniform Code of Military Justice.*" [Emphasis supplied.]

Code, supra, Article 132(2), as construed by us in the *Lawrence* case, thus makes it certain that the offense of making or using a false paper for the purpose of obtaining approval, allowance or payment of a claim against the United States is committed only when the false paper is made or used with that *objective in view*. As noted above, it is conceded by all that this occurred, with respect to the August 7th voucher, by September 1, 1961, as that is the date on which Stubli posted the entitlement to payment to accused's records. Absent any evidence that accused was being asked to do more than just replace this missing voucher, the offense was not committed again on November 15th by giving the Government a duplicate of this manifest in order that its records might be complete. Yet, that is all this transcript shows, and, at that time, the claim had been approved, paid, and allowed upon the basis of the original August 7th manifest. Moreover, there is not the slightest intimation in the record that the accused was now being called upon to produce further proof of his entitlement to retain this "jump pay" which he had already received.

For the foregoing reasons, therefore, I would conclude that accused's offense involving the August 7th voucher was committed months before Stubli approached him for the purpose of obtaining a copy of this earlier document. As the evidence permits, in my opinion, the court-martial reasonably to infer that Stubli then suspected him of having filed a false manifest in this matter, I would hold that the question of compliance with Article 31 should have been submitted to its members under appropriate instructions. United States v Gorko, supra.

Assuming, however, that my brothers correctly read the record when they conclude that Ward was called upon by Stubli to produce the false voucher in order to substantiate his continued entitlement to the parachute pay which he had received and that he thereby committed a new offense, I am, as noted above, still of the opinion that an issue is raised concerning the admissibility of the document. Apparently, they are willing to concede *arguendo* that the finance clerk suspected accused but conclude that no warning was required because the offense itself was not committed until the document was produced. The effect of this reasoning is to overrule our prior holdings *sub silentio* and to abrogate the express command of the Congress that *no* evidence obtained in violation of Code, supra, Article 31, is admissible in evidence, regardless of whether the crime was committed before the interrogation or flowed from it.

In United States v Price, supra, accused was charged with making a false official statement, in violation of Code, supra, Article 107, 10 USC § 907. The law officer, relying on a provision in paragraph 140a of the Manual for Courts-Martial, United States, 1951, to

12

the effect that the question of warning under Code, supra, Article 31, was immaterial in a prosecution for an offense "in which the making of a false statement is an element," refused to allow defense counsel to cross-examine the witness to whom the alleged false statement had been made on the issue of such warning. We reversed, holding the Manual provision invalid, and stating, at page 592:

"We are faced then with the question of whether a statement obtained in violation of Article 31(b) and objected to on a basis of Article 31(d) is nevertheless admissible because it is being offered in proof of a violation of a certain type of crime referred to in paragraph 140a of the Manual for Courts-Martial, supra. If it is admissible, irrespective of Article 31, it would seem that the law officer's ruling was correct. But if Article 31 means what it says, he erred. We think it means what it says.

"The difficulty here results from the language employed by paragraph 140a of the Manual which appears to limit the application of Article 31 by excepting certain types of cases from its operation. *There is no correlation between the protections of Article 31 and making a false official statement. Insofar as we can determine there are no Article 107 exceptions to Article 31. If a person is a suspect or one accused, he must be warned in accordance with Article 31(b) before he can be questioned. The fact that the statement or answer requested is an official statement within the meaning of Article 107 does not restrict the protections of Article 31.*" [Emphasis supplied.]

And, in United States v Kelley, supra, we declared at page 588:

". . . Article 31(d) declares, 'No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence or unlawful inducement shall be received in evidence against him in a trial by court-martial.' There is nothing ambiguous about these Code provisions. A statement was here requested by a person subject to the Code and directed toward 'a person suspected of an offense' without first informing that individual as to the nature of the accusation against him and without advising him that he would not have to make any statement and if he did make a statement that it could be used against him in a trial by court-martial. *Article 31 was therefore violated. Since Article 31 represents the law under which this Court and the Armed Forces operate, it is controlling and nothing in the Manual can whittle away the substantive protections given by it to an accused. Any evidence obtained in violation of Article 31 is inadmissible.*" [Emphasis supplied.]

In United States v Williams, 8 USCMA 443, 24 CMR 253, we likewise pointed out at page 444:

"In United States v Wilson, 2 USCMA 248, 8 CMR 48, we reviewed the Congressional background of Article 31. *We pointed out that the Article occupies so important a position in the administration of military justice that we would not sanction any 'departure from the clear mandate' of its provisions.* Id. at 255. Over the years, we have consistently reiterated this principle; *we have refused to uphold a conviction based upon evidence obtained and admitted in violation of the Article; and we have consistently declined to weigh the other evidence of guilt for the purpose of affirming a conviction.* United States v Holmes, 6 USCMA 151, 19 CMR 277; United States v Taylor, supra; United States v Hernandez, 4 USCMA 465, 16 CMR 39; see also United States v Yearty, 8 USCMA 191, 23 CMR 415. Time and experience have served to emphasize the fundamental correctness of our position." [Emphasis supplied.]

To the same effect, see United States v Haynes, 9 USCMA 792, 27 CMR 60. Cf. United States v Morrison, supra.

The willingness of my brothers to assume that Stubli suspected accused of an offense in connection with the

August 7th incident and to hold that, despite such suspicion, no duty to advise him under Code, supra, Article 31, arose, because the making of the false voucher itself constituted an offense completely disregards the cited authorities. As those cases note, the command of Article 31 prohibits the receipt in evidence of *any* statement obtained in violation of its terms. Just as "there are no Article 107 exceptions to Article 31," there can be no Article 132 exception to this important statute. As Mr. Justice Holmes said, in Silverthorne Lumber Co. v United States, 251 US 385, 64 L ed 319, 40 S Ct 182, at page 392:

". . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

Such is the express command of Code, supra, Article 31, regarding statements obtained from suspected persons. We have consistently so held since the inception of this Court, and I refuse at this late date to become a party to an opinion which flies not only in the face of our prior decisions but also rejects the clear and unambiguous language of the legislature.

United States v Price, supra; United States v Kelley, supra.

Turning to the last question before us, it is apparent I also disagree with my brothers' conclusion that there is here sufficient evidence to support the findings of guilty of specification 1 of the Charge. They premise their conclusion upon the accused's production of the voucher copy at Stubli's request on November 15. As noted above, I believe the evidence conclusively demonstrates the making and using of the voucher before September 1, 1961, and that the furnishing of the copy to Stubli on November 15 did not constitute a violation of Code, supra, Article 132. Had the Government alleged the use of the original document on or about September 1, 1961, sufficiency would undoubtedly not be in issue here, but it sought to rely only on allegations and proof regarding the production of the copy. I deem this to be no more than evidence of the earlier, uncharged crime.

For the reasons cited, therefore, I would reverse the decision of the board of review, order the findings of guilty as to specification 1 dismissed, and return the record of trial for reassessment of the sentence on the basis of the remaining count.